GABRIEL SEYMOUR ET AL. *v.* ELECTIONS
ENFORCEMENT COMMISSION
(SC 16167)

McDonald, C. J., and Borden, Norcott, Palmer and Sullivan, Js.

*(Two justices dissenting in one dissenting opinion)*

Argued December 9, 1999—officially released December 19, 2000

*David R. Schaefer*, with whom, on the brief, was *Whitney North Seymour, Jr.*, for the appellants (plaintiffs).

*Eliot D. Prescott*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Carolyn K. Querijero*, assistant attorney general, for the appellee (defendant).

*Martin B. Margulies* and *Philip D. Tegeler* filed a brief for the Connecticut Civil Liberties Union Foundation as amicus curiae.

*Opinion*

NORCOTT, J. This case raises important questions regarding the constitutionality of Connecticut's political advertising disclosure laws and the commission created to enforce them. After an evidentiary hearing, the defendant, the state elections enforcement commission (commission), found that the plaintiffs, Gabriel Seymour and Robert Reid, had violated certain campaign finance laws. The plaintiffs appealed from the decision of the commission to the trial court. The trial court affirmed the commission's finding that the plaintiffs had violated the campaign law in question and its order that they were henceforth to comply with the statute, and accordingly, dismissed the plaintiffs' appeal. This appeal followed.[1] We affirm the judgment of the trial court.

The following facts are relevant to our disposition of this appeal. This case arises out of the plaintiffs' 1997 campaign for the position of first selectman and a position on the board of selectmen of Falls Village, respectively. On September 3, 1997, and again on September 12, 1997, the plaintiffs released statements to local

---

[1] The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

newspapers with the intention that the statements be published. The plaintiffs prepared each statement on a personal computer and faxed the documents to at least three local newspapers. The expenses associated with the statements were shared equally by the plaintiffs. Although the statements contained both plaintiffs' names and telephone numbers, neither statement indicated who had paid for them.

On September 18, 1997, and again on October 8, 1997, James P. McGuire filed complaints[2] with the commission claiming that the plaintiffs had failed to include the "paid for by" attribution requirement, as mandated by General Statutes § 9-333w (a).[3] These complaints remained pending throughout the duration of the campaign. On November 4, 1997, Seymour was elected first selectman, and Reid was unsuccessful in his bid for second selectman.[4]

---

[2] Collectively, these complaints have come to be known as the McGuire complaints. There is some confusion as to the actual dates that the complaints were filed. The other dates referred to, September 16, 1997, and October 2, 1997, are the dates listed on McGuire's affidavits. Those affidavits then were filed with the commission on September 18, 1997, and October 8, 1997.

An additional complaint also was lodged prior to the McGuire complaints. The DeMazza complaint, as it was known, eventually was discontinued after voluntary payment of a $100 penalty by a respondent, other than either plaintiff, and is not the subject of this appeal.

[3] General Statutes § 9-333w (a) provides: "No individual shall make or incur any expenditure with the cooperation of, at the request or suggestion of, or in consultation with any candidate, candidate committee or candidate's agent, and no candidate or committee shall make or incur any expenditure for any written, typed or other printed communication which promotes the success or defeat of any candidate's campaign for nomination at a primary or election or solicits funds to benefit any political party or committee unless such communication bears upon its face the words 'paid for by' and the following: (1) In the case of such an individual, the name and address of such individual; (2) in the case of a committee other than a party committee, the name of the committee and its campaign treasurer; or (3) in the case of a party committee, the name of the committee."

[4] Reid actually tied his opponent in votes, but did not take office for reasons that are not relevant to this appeal.

On January 14, 1998, a commission hearing officer conducted a contested evidentiary hearing. A report was issued on March 3, 1998. The report stated that the plaintiffs' failure to list the identity and address of the paying party accompanied by the words "paid for by" constituted a "technical" violation of § 9-333w. The commission adopted the report of the hearing officer and ordered the plaintiffs henceforth to comply with the statute. The trial court dismissed the plaintiffs' appeal from the decision of the commission.

The plaintiffs' appeal from the judgment of the trial court raises the following issues: (1) whether the disclosure requirements of § 9-333w violate the first and fourteenth amendments to the United States constitution, thereby rendering the statute void and unenforceable; (2) whether the alleged delay of any hearing or decision by the commission until after the election, coupled with the alleged assertions, by the commission, of the statutory violation by the plaintiffs, violated the plaintiffs' constitutional rights under the first, fifth and fourteenth amendments to the United States constitution; and (3) whether operational control of the commission's enforcement activities by a dominant majority of legislative political appointees, as provided by General Statutes §§ 9-7a and 9-7b,[5] violates Connecticut's separation

[5] General Statutes § 9-7a (a) provides in relevant part: "There is established a State Elections Enforcement Commission to consist of five members, not more than two of whom shall be members of the same political party and at least one of whom shall not be affiliated with any political party. Of the members first appointed hereunder, one shall be appointed by the minority leader of the House of Representatives and shall hold office for a term of one year from July 1, 1974; one shall be appointed by the minority leader of the Senate and shall hold office for a term of three years from said July first; one shall be appointed by the speaker of the House of Representatives and shall hold office for a term of one year from said July first; one shall be appointed by the president pro tempore of the Senate and shall hold office for a term of three years from said July first, and one shall be appointed by the Governor, provided that such member shall not be affiliated with any political party, and shall hold office for a term of five years from said July first. . . ."

General Statutes § 9-7b (a) provides in relevant part: "The State Elections

of powers doctrine. We conclude that: (1) § 9-333w is constitutional; (2) the alleged delay did not violate the plaintiffs' constitutional rights; and (3) §§ 9-7a and 9-7b do not violate our separation of powers doctrine. Accordingly, we affirm the trial court's judgment.

I

The essence of the first issue is whether the disclosure requirements set forth in § 9-333w unconstitutionally burden the plaintiffs' right to free speech. The United States Supreme Court has repeatedly held that political speech is at the nucleus of the protection afforded by the first amendment. "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' *Roth* v. *United States*, 354 U.S. 476, 484 [77 S. Ct. 1304, 1 L. Ed. 2d 1498] (1957). Although First Amendment protections are not

Enforcement Commission shall have the following duties and powers:

"(1) To make investigations on its own initiative or with respect to statements filed with the commission by the Secretary of the State or any town clerk, or upon written complaint under oath by any individual, with respect to alleged violations of any provision of the general statutes relating to any election or referendum, any primary held pursuant to section 9-423, 9-424, 9-425 or 9-464 or any primary held pursuant to a special act, and to hold hearings when the commission deems necessary to investigate violations of any provisions of the general statutes relating to any such election, primary or referendum, and for the purpose of such hearings the commission may administer oaths, examine witnesses and receive oral and documentary evidence, and shall have the power to subpoena witnesses under procedural rules the commission shall adopt, to compel their attendance and to require the production for examination of any books and papers which the commission deems relevant to any matter under investigation or in question. . . .

"(2) To levy a civil penalty . . . . The commission may levy a civil penalty against any person under subparagraph (A) or (B) of this subdivision only after giving the person an opportunity to be heard at a hearing conducted in accordance with sections 4-176e to 4-184, inclusive. . . ."

confined to 'the exposition of ideas,' *Winters* v. *New York*, 333 U.S. 507, 510 [68 S. Ct. 665, 92 L. Ed. 840] (1948), 'there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs . . . of course includ[ing] discussions of candidates . . . .' *Mills* v. *Alabama*, 384 U.S. 214, 218 [86 S. Ct. 1434, 16 L. Ed. 2d 484] (1966). This no more than reflects our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open,' *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 270 [84 S. Ct. 710, 11 L. Ed. 2d 686] (1964). In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation. As the Court observed in *Moniter Patriot Co.* v. *Roy*, 401 U.S. 265, 272 [91 S. Ct. 621, 28 L. Ed. 2d 35] (1971), 'it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office.' " *Buckley* v. *Valeo*, 424 U.S. 1, 14–15, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976).

Political speech is given the highest level of scrutiny under our rubric of judicial review. "When a law burdens core political speech, we apply 'exacting scrutiny,' and we uphold the restriction only if it is narrowly tailored to serve an overriding state interest." *McIntyre* v. *Ohio Elections Commission*, 514 U.S. 334, 347, 115 S. Ct. 1511, 131 L. Ed. 2d 426 (1995); see also *First National Bank of Boston* v. *Bellotti*, 435 U.S. 765, 786, 98 S. Ct. 1407, 55 L. Ed. 2d 707 (1978). Because the statute at issue in the present case requires that certain information be included within the distributed material, i.e., the identity of the person paying for the distributed material, it necessarily regulates the content of speech. As a result, the limitation on political expression is

subject to exacting scrutiny. See *Meyer* v. *Grant,* 486 U.S. 414, 420, 108 S. Ct. 1886, 100 L. Ed. 2d 425 (1988).

The Supreme Court previously has "acknowledged that there are governmental interests sufficiently important to outweigh the possibility of infringement [upon the first amendment], particularly when the 'free functioning of our national institutions' is involved." *Buckley* v. *Valeo,* supra, 424 U.S. 66, quoting *Communist Party* v. *Subversive Activities Control Board,* 367 U.S. 1, 97, 81 S. Ct. 1357, 6 L. Ed. 2d 625 (1961). The court has noted that, "[d]espite the ritualistic ease with which we state this now-familiar [exacting scrutiny] standard, its announcement does not allow us to avoid the truly difficult issues involving the First Amendment. Perhaps foremost among these serious issues are cases that force us to reconcile our commitment to free speech with our commitment to other constitutional rights embodied in governmental proceedings." *Burson* v. *Freeman,* 504 U.S. 191, 198, 112 S. Ct. 1846, 119 L. Ed. 2d 5 (1992). The present case requires such a reconciliation.

The statutory scheme at issue seeks to balance an individual's right to free speech with the public's interest in ensuring fair and honest elections. Although an individual's right to free speech is well known and widely publicized, the state's obligation to safeguard the electoral process is frequently neglected, although it, too, is of great import. Because of the critical role that elections play in our democratic society, the Supreme Court has recognized "that a State indisputably has a compelling interest in preserving the integrity of its election process. . . . The Court thus has upheld generally applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself. . . . In other words, it has recognized that a State has a compelling interest in ensuring that an individual's right to vote is not undermined by fraud in the

election process." (Citations omitted; internal quotation marks omitted.) Id., 199. Indeed, "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer* v. *Brown*, 415 U.S. 724, 730, 94 S. Ct. 1274, 39 L. Ed. 2d 714 (1974); see also *Buckley* v. *American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 119 S. Ct. 636, 142 L. Ed. 2d 599 (1999). It is with these two overriding, and sometimes competing, liberties in mind that we subject Connecticut's disclosure statute to a strict scrutiny evaluation.

## A

The commission justifies its restriction with four compelling state interests. First, it claims that the state has a compelling interest in preventing actual or perceived corruption in candidate elections. The commission next asserts that the state has a compelling interest in enforcing other constitutional campaign finance laws. The commission's third claimed compelling interest is based on the importance of informing voters about candidates in an election for public office. Finally, the commission maintains that preventing fraud and libel is a valid compelling state interest. We address each asserted interest seriatim.

## 1

The commission first claims that it has a compelling interest in preventing actual or perceived corruption in candidate elections. We agree.

In the landmark election law case of *Buckley* v. *Valeo*, supra, 424 U.S. 67, the United States Supreme Court explicitly concluded that eliminating corruption in candidate elections is a substantial state interest. See also *Nixon* v. *Shrink Missouri Government PAC*, 528 U.S. 377, 385–89, 120 S. Ct. 897, 145 L. Ed. 2d 886 (2000);

*Federal Election Commission* v. *National Conservative Political Action Committee,* 470 U.S. 480, 497, 105 S. Ct. 1459, 84 L. Ed. 2d 455 (1985). The court explained that "[a] public armed with information about a candidates's most generous supporters is better able to detect any post-election special favors that may be given in return. . . . Congress could reasonably conclude that full disclosure during an election campaign tends to prevent the corrupt use of money to affect elections." (Citation omitted; internal quotation marks omitted.) *Buckley* v. *Valeo,* supra, 67.

The plaintiffs contend, however, that the United States Supreme Court's decision in *McIntyre* v. *Ohio Elections Commission,* supra, 514 U.S. 334, rejected the *Buckley* reasoning. In *McIntyre,* the petitioner had distributed unsigned, and hence anonymous leaflets to individuals attending a public meeting at a town middle school. The leaflets expressed her opposition to a proposed tax levy that was to be discussed that evening. Id., 337. A school official eventually filed a complaint, charging that her distribution of unsigned leaflets violated Ohio state election laws, which prohibited anonymous pamphleteering. Id., 338. The state elections enforcement commission agreed and imposed a $100 fine. Id. The Supreme Court struck down the statute as an unconstitutional abridgement of the petitioner's right to freedom of speech. Id., 357.

The statute at issue in *McIntyre* applied to referenda and other issue-based ballot measures, *as well as* to candidate elections.[6] In striking down the statute, the

---

[6] "Ohio Rev. Code Ann. § 3599.09(A) (1988) provides [in relevant part]: 'No person shall write, print, post, or distribute, or cause to be written, printed, posted, or distributed, a notice, placard, dodger, advertisement, sample ballot, or any other form of general publication which is designed to promote the nomination or election or defeat of a candidate, or to promote the adoption or defeat of any issue, or to influence the voters in any election, or make an expenditure for the purpose of financing political communications through newspapers, magazines, outdoor advertising facilities, direct mailings, or other similar types of general public political advertising, or

court in *McIntyre* specifically stated that, "[i]n candidate elections, the Government can identify a compelling state interest in avoiding the corruption that might result from campaign expenditures. Disclosure of expenditures lessens the risk that individuals will spend money to support a candidate as a quid pro quo for special treatment after the candidate is in office. Curriers of favor will be deterred by the knowledge that all expenditures will be scrutinized by the Federal Election Commission and by the public for just this sort of abuse." Id., 356. The Supreme Court specifically noted, however, that referenda and other issue-based ballot measures would not breed the same opportunities for corruption. Id., 352 n.15. In those situations, there are no elected officials beholden to those who supported the candidate during the campaign. "The risk of corruption perceived in cases involving candidate elections . . . simply is not present in a popular vote on a public issue." (Citations omitted.) *First National Bank of Boston* v. *Bellotti*, supra, 435 U.S. 790.

Mindful of this precept, we note that, by its terms, § 9-333w (a) is limited to elections and party-related solicitations. There is no indication that the disclosure statute applies to referenda or other issue-based ballot measures. Furthermore, in the present case, it was applied only to a candidate election. Thus, the first amendment concerns that the United States Supreme Court expressed in *McIntyre* are inapplicable here. Accordingly, the prevention of actual and perceived corruption in candidate elections is a compelling and valid state interest.

---

through flyers, handbills, or other nonperiodical printed matter, unless there appears on such form of publication in a conspicuous place or is contained within said statement the name and residence or business address of the chairman, treasurer, or secretary of the organization issuing the same, or the person who issues, makes, or is responsible therefor. . . .' " *McIntyre* v. *Ohio Elections Commission*, supra, 514 U.S. 338 n.3.

2

Second, the commission contends that the attribution requirement directly advances the state's ability to investigate and enforce other campaign finance laws that are, in fact, constitutional. This interest was also upheld by the Supreme Court in *Buckley*. There, the court stated that "record-keeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations of the contribution limitations . . . ." *Buckley* v. *Valeo*, supra, 424 U.S. 67–68. Moreover, although the enforcement interest was not directly called into question in *McIntyre*, the court nevertheless acknowledged that enforcing other laws may be a valid interest under some circumstances. "We recognize that a State's enforcement interest might justify a more limited identification requirement, but Ohio has shown scant cause for inhibiting the leafletting at issue here." *McIntyre* v. *Ohio Elections Commission*, supra, 514 U.S. 353.

We are persuaded that Connecticut's disclosure requirements assist the commission in its investigative function. The state points out that political action committees are prohibited from donating more than $5000 to candidates for the office of governor in an upcoming election. See General Statutes § 9-333o (d) (1).[7] During campaigns, however, candidates often send mass mailings at a substantial cost. The attribution requirement allows the commission to monitor strictly who is paying these costs, thereby ensuring that political action committees are not exceeding their statutory contribution limits.

---

[7] General Statutes § 9-333o (d) provides in relevant part: "A political committee organized by a business entity shall not make a contribution or contributions to or for the benefit of any candidate's campaign for nomination at a primary or any candidate's campaign for election to the office of: (1) Governor, in excess of five thousand dollars . . . ."

Furthermore, the attribution requirement assists in monitoring self-funded campaigns. Self-funded campaigns are not subject to the same guidelines as campaigns funded by donations. The attribution requirement provides the commission with another way to ensure that campaign literature is funded, not from third parties, but from the candidates themselves. Both of these examples demonstrate how the attribution requirement allows the commission to enforce election laws while limiting the time, effort and financial resources necessarily consumed during the investigation. For these reasons, we conclude that investigating and enforcing other constitutional campaign finance laws is a valid compelling state interest.

3

The commission next claims that the state has a compelling interest in informing voters about candidates in an election for public office. This has been an evolving issue.

In *McIntyre*, the court clearly rejected the informational interest when it announced: "Insofar as the interest in informing the electorate means nothing more than the provision of additional information that may either buttress or undermine the argument in a document, we think the identity of the speaker is no different from other components of the document's content that the author is free to include or exclude. . . . The simple interest in providing voters with additional relevant information does not justify a state requirement that a writer make statements or disclosures she would otherwise omit." (Citation omitted.) *McIntyre* v. *Ohio Elections Commission*, supra, 514 U.S. 348. The court reasoned that "[p]eople are intelligent enough to evaluate the source of an anonymous writing." Id., 348 n.11. The manner in which the court in *McIntyre* disposed

of the informational interest, however, is contrary to the court's previous handling of this issue.

In *Buckley*, the Supreme Court expressly held the informational interest to be compelling, and therefore recognized it as sufficient to validate disclosure requirements with regard to candidate elections. The court announced that "disclosure provides the electorate with information as to where political campaign money comes from and how it is spent by the candidate in order to aid the voters in evaluating those who seek federal office. It allows voters to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches. The sources of a candidate's financial support also alert the voter to the interests to which a candidate is most likely to be responsive and thus facilitate predictions of future performance in office." (Internal quotation marks omitted.) *Buckley* v. *Valeo*, supra, 424 U.S. 66–67.

The court reaffirmed the validity of this interest two years later in *Bellotti*. The court explained that citizens of our democratic society are responsible for evaluating conflicting messages, but that, in making such evaluations, they may consider the source and credibility of the advocate. *First National Bank of Boston* v. *Bellotti*, supra, 435 U.S. 791–92. The court stated: "Corporate advertising, unlike some methods of participation in political campaigns, is likely to be highly visible. Identification of the source of advertising may be required as a means of disclosure, so that the people will be able to evaluate the arguments to which they are being subjected." Id., 792 n.32.

In *McIntyre*, the court distinguished these cases by explaining that, when independent expenditures are involved, the state's interest in informing its electorate are not served significantly by requiring disclosure. "[I]n

the case of a handbill written by a private citizen who is not known to the recipient, the name and address of the author add little, if anything, to the reader's ability to evaluate the document's message." *McIntyre* v. *Ohio Elections Commission*, supra, 514 U.S. 348–49. In specific response to the informational interest substantiated by *Buckley* and *Bellotti*, the court in *McIntyre* explained that "[t]hose comments concerned contributions to the candidate or expenditures authorized by the candidate or his responsible agent. They had no reference to the kind of independent activity pursued by [the petitioner]." Id., 354. Thus, in distinguishing itself from *Buckley* and *Bellotti*, the court in *McIntyre* nonetheless preserved the legitimacy of the informational interest in cases not involving independent expenditures.

There is a fundamental difference between the situation in *McIntyre* and a disclosure statute, like § 9-333w, that is limited to candidate elections. Section 9-333w (a) does not present the possibility that a private individual would be compelled to disclose her identity when that information would "add little, if anything, to the reader's ability to evaluate the document's message." Id., 349. We trust that Connecticut's disclosure requirement fairly enables voters to evaluate better the message and its source. In addition, we note that § 9-333w (a) applies to solicitations. Addressing a similar statute, the United States Court of Appeals for the Second Circuit upheld the informational interest as compelling as applied to solicitations. The court stated: "*McIntyre*'s holding that simply informing the electorate is not a sufficiently compelling interest to justify a ban on anonymous campaign literature . . . was based on the premise that the interest in informing the electorate means nothing more than the provision of additional information that may either buttress or undermine the argument in a document. . . . In this case, however, the government's

interest in identifying who paid for a solicitation letter
. . . goes significantly further: by avoiding any misunderstanding as to the actual recipient of the solicited contribution, [the statute] enables the solicitee to contribute money to those groups which truly reflect his or her beliefs. This is the sort of critical information that protects the integrity of the electoral process." (Citations omitted; internal quotation marks omitted.) *Federal Election Commission* v. *Survival Education Fund, Inc.*, 65 F.3d 285, 297 (2d Cir. 1995). The Second Circuit's reasons for upholding this interest are equally applicable to the present case. We conclude that the informational interest sought to be vindicated by Connecticut's disclosure statute is compelling.

4

Finally, the commission claims that the state has a compelling interest in preventing fraud and libel, and further, that the statute serves to protect candidates. Although this interest was insufficient under the facts of *McIntyre*, the Supreme Court left open the possibility that preventing fraud and libel may be a valid compelling interest during the course of an election. *McIntyre* v. *Ohio Elections Commission*, supra, 514 U.S. 349. The court admitted that Ohio's interest in preventing fraud and libel "carries special weight during election campaigns when false statements, if credited, may have serious adverse consequences for the public at large." Id.

The court determined, however, that Ohio has other election laws that specifically prohibit the dissemination of false statements during political campaigns. Id. "Thus, Ohio's prohibition of anonymous leaflets plainly is not its principal weapon against fraud. Rather, it serves as an aid to enforcement of the specific prohibitions and as a deterrent to the making of false statements by unscrupulous prevaricators." Id., 350–51.

Although the benefits provided by statute were "legitimate," they could not justify the regulation's "extremely broad prohibition." Id., 351.[8] On the contrary, Connecticut's statutes do not contain a provision that specifically prohibits fraud and libel during a campaign. Thus, Connecticut relies more heavily on its disclosure statute to combat the occurrence of these evils during a candidate election.

The amicus curiae claims that the availability of common-law tort actions in Connecticut is sufficient protection against fraud and libel. Although it is true that *McIntyre* specifically mentioned common-law actions as a means to assail the harms brought on by fraud and libel, reliance on that case to support the amicus' assertion is misplaced. Although the court in *McIntyre* noted that Ohio was able to rely on its common-law tort of libel for protection, it made this reference as an alternative to the statute at issue in that case.[9] Id., 350 n.13. Ohio's direct ban on election fraud coupled with common-law actions were deemed to be sufficient protection against such evils. In the wake of these combined efforts, the anonymity ban was nothing more than a supplement to serve this interest.[10] Id. Nothing in *McIntyre* suggests that the availability of common-law tort actions *alone* would constitute a sufficient alternative means of preventing fraud and libel.

---

[8] The Supreme Court stated: "Although these ancillary benefits are assuredly legitimate, we are not persuaded that they justify § 3599.09(A)'s extremely broad prohibition." *McIntyre* v. *Ohio Elections Commission*, supra, 514 U.S. 351.

[9] The court explained, "[t]o the extent those [election code] provisions may be underinclusive, Ohio courts also enforce the common-law tort of defamation." *McIntyre* v. *Ohio Elections Commission*, supra, 514 U.S. 350–51 n.13.

[10] The Supreme Court noted: "Like other forms of election fraud, then, Ohio directly attacks the problem of election-related libel; to the extent that the anonymity ban serves the same interest, it is merely a supplement." *McIntyre* v. *Ohio Elections Commission*, supra, 514 U.S. 350–51 n.13.

Moreover, the mere existence of a common-law remedy does not, in itself, defeat the compelling interest served by § 9-333w (a). In enacting the disclosure statute, the legislature had a specific purpose in mind. According to Jeffrey Garfield, the then executive director and general counsel of the commission, which was the proponent of the bill, the statute was intended to have "the effect of promoting truth in political advertising, and in improving the enforcement capacity of the commission." Conn. Joint Standing Committee Hearings, Government Administrations and Elections, Pt. 1, 1980 Sess., p. 72. We presume that the legislature, by enacting § 9-333w, deemed common-law tort remedies to be insufficient to satisfy these needs. See *State* v. *Nixon*, 231 Conn. 545, 559, 651 A.2d 1264 (1995) ("[w]hen the legislature acts, however, it is presumed to know the state of the law"); *Zachs* v. *Groppo*, 207 Conn. 683, 696, 542 A.2d 1145 (1988) ("the legislature is presumed to have acted with knowledge of existing statutes and with an intent to create one consistent body of laws"). This is not to say that the legislature's need to create the statute thereby renders it constitutional. We conclude only that a void recognized by the legislature was not being served by the then existing common law. In other words, common-law tort remedies alone were deemed to be insufficient to serve the interests protected by § 9-333w (a).

Connecticut's disclosure statute is not duplicative of a common-law tort remedy. Without it, a gap would be created in the law where § 9-333w (a) once governed. Accordingly, we conclude that the state's interest in preventing fraud and libel is justifiably served by the disclosure statute.

In this regard, the commission recently was involved in a case that highlights the importance of preventing fraud and libel, and how disclosure statutes work to protect candidates. See State Elections Enforcement

Commission, Stipulated Agreement Containing Consent Order, File Nos. 98-167, 98-169. During a certain campaign in 1998, written materials, which did not contain the attribution information, were circulated containing the challenger's name and telephone number, and were made to appear as though they were distributed by the challenger himself. Id. The materials also created the impression that the challenger was working closely with an individual, who was publicly known to have a criminal record. Id. After an investigation, the commission learned that the materials were created by someone close to the incumbent's campaign. Id.

Thus, the attribution requirement works to prevent fraud and libel and, specifically, protects candidates from unscrupulous attacks by requiring that those who seek to mislead the electorate into thinking that the *candidate* has issued certain materials, disclose their identity. That disclosure requirement will serve as a disincentive to such misleading conduct. Those working with candidates or campaigns risk violating § 9-333w (a) for failure to disclose the payor of the distribution. Consequently, the attribution requirement works to deter unethical tactics, because violators will be held publicly accountable.

In sum, we conclude that the state has valid compelling interests in preventing corruption, advancing the state's ability to investigate campaign finance laws, providing the electorate with information, and deterring fraud and libel. These interests, together and separately, justify the disclosure requirement set forth in § 9-333w (a).

## B

In accordance with the exacting scrutiny standard set forth by *McIntyre* v. *Ohio Elections Commission*, supra, 514 U.S. 347, we now must determine whether § 9-333w (a) is narrowly tailored to serve those state

interests that we have found to be compelling. The court in *McIntyre* provided a list of factors that it considered in its determination that the Ohio statute in question was unconstitutional. The court explained: "As this case demonstrates, the prohibition encompasses documents that are not even arguably false or misleading. It applies not only to the activities of candidates and their organized supporters, but also to individuals acting independently and using only their own modest resources. It applies not only to elections of public officers, but also to ballot issues that present neither a substantial risk of libel nor any potential appearance of corrupt advantage. It applies not only to leaflets distributed on the eve of an election, when the opportunity for reply is limited, but also to those distributed months in advance. It applies no matter what the character or strength of the author's interest in anonymity." Id., 351–52. With these criteria in mind, we conclude that § 9-333w (a) is narrowly tailored to serve the state's interests.

A comparative analysis of the Ohio and Connecticut statutes exposes critical distinctions, the most significant of which reveals that they apply to distinct categories of persons. The Ohio statute prohibits *anyone* from distributing certain materials unless identified. The Connecticut statute applies only to individuals associated in some way with a campaign.[11] Thus, the Connecti-

---

[11] Ohio's statute prohibited anyone from writing or distributing any "publication which is designed to promote the nomination or election or defeat of a candidate, or to promote the adoption or defeat of any issue, or to influence the voters in any election" unless the name of the party responsible for or issuing the statement appears on the distribution. Ohio Rev. Code Ann. § 3599.09(A) (1988). The Connecticut statute, however, provides that "[n]o individual shall make or incur any expenditure with the cooperation of, at the request or suggestion of, or in consultation with any candidate, candidate committee or candidate's agent, and no candidate or committee shall make or incur any expenditure for any . . . communication which promotes the success or defeat of any candidate's campaign for nomination at a primary or election or solicits funds to benefit any political party or committee unless" the payor is identified. General Statutes § 9-333w (a).

cut statute requires disclosure of the identity of a party paying for a distribution if that party is working at the direction of an election committee. It would not, however, require such disclosure by an individual who is not associated with a campaign in any way. In other words, § 9-333w (a) does not prevent or hinder an individual, acting independently, from expressing her opinion in any manner. The critical distinction between candidates or their organized supporters and independent individuals was noted by the Supreme Court in *Buckley*[12] and confirmed in *McIntyre*. See id., 351 n.14.

Furthermore, it is notable that the Ohio statute applied to referenda, as well as to candidate elections. Referenda entail the practice of submitting legislative proposals to popular vote. Referenda, however, do not encompass the same dangers as candidate elections. Id., 352–53 and 352 n.15. Although the opportunities to fashion disparaging remarks about one's opponent are prevalent during candidate elections, expressions of opinion on referenda issues are unlikely to provide a similar platform of negative commentary. Personal opinions concerning the benefits or disadvantages of a proposal do not result in comparable personal attacks. Consequently, the potentially libelous and fraudulent statements that may hinder a candidate's chances of attaining elective office are not of equal concern in the arena of referenda. Indeed, the Second Circuit Court of Appeals has discussed the difference between candidate elections and referenda voting as it relates to corporate contributions. "Corporate funds paid to a candidate or political party have the potential of creating debts that must be paid in the form of special interest

---

[12] The Supreme Court stated: "Treating these expenses as contributions when made to the candidate's campaign or at the direction of the candidate or his staff forecloses an avenue of abuse without limiting actions voluntarily undertaken by citizens independently of a candidate's campaign." *Buckley* v. *Valeo*, supra, 424 U.S. 37. The court went on to strike down limitations on independent expenditures.

legislation or administrative action. In contrast, when the issue is one to be resolved by the public electorate monies paid by a corporation for public expression of its views create no debt or obligation on the part of the voters to favor the corporate contributor's special interest. Although large private companies have undoubtedly been tempted to 'buy' the election of political candidates in the expectation of receiving favors if their candidates should be elected, it is difficult to see how such motivation would play any substantial role in an attempt to influence votes for or against a referendum." *Schwartz* v. *Romnes*, 495 F.2d 844, 851 (2d Cir. 1974).

Unlike Ohio's disclosure statute, § 9-333w (a) concerns only communication discussing candidates for election or the solicitation of funds for political parties. Therefore, § 9-333w (a) does not run afoul of the same obstacles on which the Ohio statute foundered. In this way, Connecticut's disclosure statute is far more narrowly tailored than Ohio's disclosure statute.

In holding that § 9-333w (a) is constitutional, we do not thereby undermine the important role that anonymity has played in American political culture. We acknowledge that anonymous distribution of one's ideas is not only protected by the first amendment, but lies at the core of its existence. It is well established that "[t]he decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible. . . . Accordingly, an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment." *McIntyre* v. *Ohio Elections Commission*, supra, 514 U.S. 341–42. Similarly, in *Talley* v. *California*, 362 U.S. 60, 64, 80 S. Ct. 536, 4 L. Ed. 2d 559 (1960), the

court held that the first amendment protects the distribution of anonymous handbills urging a boycott of certain local merchants. Although the importance of the right to remain anonymous is indisputable, that does not mean that anonymity is an absolute right. See *Citizens Against Rent Control* v. *Berkeley*, 454 U.S. 290, 299–300, 102 S. Ct. 434, 70 L. Ed. 2d 492 (1981) (noting that legislature may, under valid circumstances, ban anonymous contributions); *Buckley* v. *Valeo*, supra, 424 U.S. 1 (upholding disclosure statutes).

Accordingly, we conclude that the present issue is readily distinguishable from those presented by *McIntyre* and *Talley*. Section 9-333w (a) applies to candidates and those associated with candidates, not persons unrelated to that candidacy. The idea that a candidate has an absolute right to anonymous speech when discussing the very issues that lie at the center of her campaign is paradoxical. "There are inherent limitations of a unique and significant nature regarding any claim to the right of privacy on the part of candidates and incumbent public officials." *Fritz* v. *Gorton*, 83 Wash. 2d 275, 294, 517 P.2d 911 (1974). Candidates, by their very nature, hope to gain support by aligning themselves with particular issues. This process necessarily calls for one to identify a named candidate, with that candidate's public views. Thus, when candidate speech is involved, fears of "retaliation" or "social ostracism" are severely limited. A per se right to anonymity in this situation simply would be untenable.

Moreover, our state disclosure statute does not impede one's ability to contribute to a campaign, even if that individual is associated with the campaign's efforts. It is true that one working in cooperation with a campaign, wishing to make a contribution in the form of some written distribution, would be required to disclose his identity. Other alternatives are available, however, for one who wishes to refrain from having his

name printed on the distribution. This contributor is still free to make a financial donation directly to the campaign itself, thereby avoiding having his name listed on handbills.[13]

In addition, the plaintiffs' contention that the statute's address requirement is not sufficiently narrow and impedes one's right to anonymity is groundless. The plaintiffs contend that, if numerous public officials refrain from publishing their home address and telephone number to avoid crank letters and vandals, then those subject to § 9-333w (a) are entitled to the same anonymity. The plaintiffs' argument, however, misses the point. The address requirement adds a level of identification in order to increase accountability. Although public officials are not required to disclose their personal information, their office contact information is public knowledge. One of the foundations of our democratic society is that citizens have the opportunity to contact their public officials and representatives directly through telephone calls and letters to the appropriate office. The disclosure statute allows for the same opportunity. Section 9-333w (a) requires only that an address be listed. It does not require a personal or home address. By mandating that an address be listed on distributions falling within its ambit, § 9-333w (a) increases accountability, provides for contact information, and augments the likelihood of gaining a proper identification of the payor. We therefore conclude that the address requirement contained in § 9-333w (a) does not render the statute overbroad, and further, that our statute does not impede an individual, acting independently of a campaign, from anonymous expression.[14]

---

[13] Individual contributions, however, may also be subject to varying disclosure requirements. See, e.g., General Statutes § 9-333n (d) and (e).

[14] It is noteworthy that § 9-333w (a) was amended in 1995, in direct response to the Supreme Court's decision in *McIntyre*. See Public Acts 1995, No. 95-276. During discussions of the proposed amendment, then State Representative Susan Bysiewicz explained: "This amendment is due to a recent United States Supreme Court decision, which now requires Connecti-

Accordingly, we conclude that § 9-333w (a) is narrowly tailored to serve compelling state interests, and therefore is valid and enforceable.[15] We recognize, however, the fine line between *McIntyre* and the present case. Throughout part I of this opinion, we have weighed an individual's first amendment interest in the freedom of speech against the state's interest in protecting the integrity of the electoral process. In doing so, we conclude that the intrusion upon any specific

cut to revise its election laws with respect to attribution on political campaign advertising and materials. This recent decision indicates that attribution cannot be required when an individual acts independently to finance political advertising. What we're doing here in this amendment is proposing to revise Connecticut law to create an exception so that individual independent expenditures on leaflets and advertising would not require such attribution." 38 H.R. Proc., Pt. 15, 1995 Sess., p. 5473. Thus, we see that the legislature amended its original attribution statute to comply with *McIntyre*. We must presume that the legislature understood the legal implications of *McIntyre* and, therefore, modified § 9-333w (a) to be in compliance with that case. See, e.g., *State* v. *Nixon*, supra, 231 Conn. 559 ("[w]hen the legislature acts . . . it is presumed to know the state of the law"); *Lynn* v. *Haybuster Mfg., Inc.*, 226 Conn. 282, 291, 627 A.2d 1288 (1993) (same); *State* v. *Dabkowski*, 199 Conn. 193, 201, 506 A.2d 118 (1986) (same). "Without question, the General Assembly is presumed to have knowledge of decisions of the United States Supreme Court on constitutional issues that bind actions of the states when enacting statutes that potentially invoke such issues." *Virginia Society for Human Life, Inc.* v. *Caldwell*, 152 F.3d 268, 273 (4th Cir. 1998).

[15] The plaintiffs and the amicus contend that, even if § 9-333w (a) is generally constitutional, it is unconstitutional as applied to the plaintiffs because the expenditures involved were de minimis. The amicus cites *Buckley* to support its position. We disagree with its reading of that case. *Buckley* did not suggest that disclosure requirements below a certain threshold would be violative of the first amendment. On the contrary, *Buckley* specifically stated that it would not address that question. "[W]e do not reach the question whether information concerning gifts of this size can be made available to the public without trespassing impermissibly on First Amendment rights." *Buckley* v. *Valeo*, supra, 424 U.S. 84. The court did insist, however, that threshold disclosure amounts are a legislative decision. "The line is necessarily a judgmental decision, best left in the context of this complex legislation to congressional discretion." Id., 83. Accordingly, we will not substitute our judgment for the legislature's in deciding that some arbitrary threshold would be more reasonable than the current, "zero tolerance" line established by § 9-333w (a).

individual rights is minor when compared to the benefits gained by, and the importance of, a fair electoral process. On balance, this conclusion best serves and protects the people of Connecticut. A contrary result would undermine the integrity of the electoral process. We conclude that § 9-333w (a), as narrowly drafted, passes constitutional muster. A decision calling for a more narrowly drafted disclosure statute is best left to the legislature.

## II

The plaintiffs further claim that the commission's delay of a hearing until after the election and its publicized opinion as to the conduct of the plaintiffs violated their rights to free speech and due process under the first, fifth and fourteenth amendments to the United States constitution. We disagree.

Section 9-7a (g) addresses the commission's responsibilities with regard to written complaints. It provides in relevant part: "In the case of a written complaint . . . if the commission does not, by the sixtieth day following receipt of the complaint, either issue a decision or render its determination that probable cause or no probable cause exists for one or more violations of state election laws, the complainant or respondent may apply to the superior court for the judicial district of Hartford for an order to show cause why the commission has not acted upon the complaint and to provide evidence that the commission has unreasonably delayed action. . . ." General Statutes § 9-7a (g). The plaintiffs contend that the commission was obligated to issue a decision prior to the November 4 election. The two complaints, however, were filed on September 18 and October 8; less than sixty days prior to the election.[16] The commission, therefore, was under no

---

[16] The commission treated the second McGuire complaint (October 2, 1997) as an amendment to the first complaint (September 16, 1997). Thus, the sixty day period did not actually commence until the filing of the second complaint.

obligation to issue a decision during the time leading up to the election. If after sixty days the commission made no decision as to the complaints, the plaintiffs had recourse through the statutory remedy of an application for an order to show cause. The plaintiffs, however, failed to seek such a remedy. Moreover, § 9-7a (g) concludes: "Nothing in this subsection shall preclude the commission from continuing its investigation or taking any action permitted by section 9-7b, unless otherwise ordered by the court. . . ." General Statutes § 9-7a (g). Thus, the statute specifically provides for the commission's continued investigation until otherwise ordered, regardless of the time frame.

The plaintiffs' additional claim that the commission's "threats and expressions of opinion as to the guilt of [the] plaintiffs" violated their constitutional rights is equally unpersuasive. Specifically, the plaintiffs contend that two articles appearing in local newspapers on December 17 and 18, 1997, unfairly labeled them as guilty of the pending allegations. In those articles, a commission staff attorney stated that this was a "clear case" where the plaintiffs "broke the law."[17]

It should first be noted that these two articles could not have affected the November 4, 1997 election, because they were published more than one month *after* the election occurred. Also, the articles primarily discuss the DeMazza complaint, which was dismissed and is not the subject of this appeal. See footnote 2 of this opinion. In fact, the McGuire complaints were mentioned in only one sentence of each article. Finally, and most importantly, there is no evidence in this record to support the plaintiffs' claim that any prehearing publicity affected the adjudication of their hearing. We con-

---

[17] See T. Fitzmaurice, "Seymour, 11 Others Face Election Law Hearing in Hartford," Lakeville Journal, Dec. 18, 1997, p. A1; J. Longley, "Hearing to air campaign complaint," Waterbury Republican-American, Dec. 17, 1997, p. 1A.

clude, therefore, that the plaintiffs' constitutional rights were not violated either by the time frame in which the commission adjudicated the complaints or by the prehearing publicity.

## III

The plaintiffs' final assertion is that the composition of the commission violates the separation of powers doctrine. We disagree.

It is well established that "[t]he party attacking a validly enacted statute . . . bears the heavy burden of proving its unconstitutionality beyond a reasonable doubt and we indulge in every presumption in favor of the statute's constitutionality." *State* v. *Breton*, 212 Conn. 258, 269, 562 A.2d 1060 (1989); see also *Morascini* v. *Commissioner of Public Safety*, 236 Conn. 781, 789, 675 A.2d 1340 (1996); *Adams* v. *Rubinow*, 157 Conn. 150, 152–53, 251 A.2d 49 (1968).

In support of their claim that the makeup of the commission violates the separation of powers doctrine, the plaintiffs again rely on *Buckley*. In *Buckley*, the court held that the Federal Elections Commission could not exercise its enforcement function because four of its six voting members were appointed by Congress in violation of the separation of powers doctrine. *Buckley* v. *Valeo*, supra, 424 U.S. 127. The court reasoned that the Federal Elections Commission was comprised of "Officers of the United States" within the meaning of the appointments clause,[18] and it was therefore uncon-

---

[18] The appointments clause provides in relevant part: "[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const., art. II, § 2, cl. 2.

stitutional for the legislature, rather than the president, to appoint individuals to the commission. Id., 125–26.

Similar to the Federal Elections Commission, our state commission consists of five members, four of whom are appointed by the legislature, and the other is appointed by the governor.[19] Unlike the federal constitution, however, the Connecticut counterpart has no appointments clause. With no parallel clause in the Connecticut constitution, the appointment of high ranking officers of the state of Connecticut is not limited to the governor. In response to a letter questioning the effect of *Buckley* on the commission, the attorney general stated that "[i]t is readily apparent that the Connecticut Constitution contains no Appointments Clause similar to the one found in the United States Constitution. As a matter of fact, the Legislature has on many occasions combined with the Governor on making appointments to executive agencies. . . ."[20] Opinions, Conn. Atty.

[19] See footnote 5 of this opinion for the relevant text of § 9-7a (a).

[20] After remarking that the lack of an appointments clause allowed the governor and legislature to make joint appointments to executive agencies, the attorney general continued: "This was the situation before our Constitution of 1965 was adopted and still is the situation. Some examples of current commissions with dual appointments are the Connecticut Commission on Special Revenue, State Capitol Preservation and Restoration Commission, Commission on Hospitals and Health Care, Connecticut Solid Waste Management Advisory Council, and the Advisory Council on Aging. It appears that in this area of relationships we have operated more flexibly under the separation of powers than in the area of relationships between the Legislature and the Judiciary. This is a mere recognition of the principles that [t]he rule of separation of governmental powers cannot always be rigidly applied. . . .

"As we have noted, the appointive power in Connecticut traditionally has never been the exclusive prerogative of the executive, but instead has been shared with the legislative branch from time to time . . . . It should require little discussion to demonstrate that this system is among a number of alternatives that ensure a balance of power in government. Therefore, it is our opinion that the Supreme Court decision in *Buckley* v. *Valeo*, supra, [424 U.S. 1] does not have any adverse effect on the constitutional composition of your Commission." (Citations omitted; internal quotation marks omitted.) Opinions, Conn. Atty. Gen. (February 11, 1976).

Gen. (February 11, 1976). The lack of an appointments clause in Connecticut's constitution is fatal to the plaintiffs' argument.

In addition to the framers' decision not to adopt an appointments clause, we have long recognized that under appropriate circumstances powers may be shared by the three branches of government in this state. This court has stated that "[t]he separation of powers doctrine serves a dual function: it limits the exercise of power within each branch, yet ensures the independent exercise of that power. Nevertheless, it cannot be rigidly applied always to render mutually exclusive the roles of each branch of government. As we have recognized, the great functions of government are not divided in any such way that all acts of the nature of the function of one department can never be exercised by another department; such a division is impracticable, and if carried out would result in the paralysis of government. Executive, legislative and judicial powers, of necessity overlap each other, and cover many acts which are in their nature common to more than one department." (Internal quotation marks omitted.) *Massameno* v. *Statewide Grievance Committee*, 234 Conn. 539, 552, 663 A.2d 317 (1995). We have consistently "held that there are activities in which more than one branch of government may participate." *University of Connecticut Chapter, AAUP* v. *Governor*, 200 Conn. 386, 394, 512 A.2d 152 (1986).

We have established that "in deciding whether one branch's actions violate the constitutional mandate of the separation of powers doctrine, the court will consider if the actions constitute: (1) an assumption of power that lies exclusively under the control of another branch; or (2) a significant interference with the orderly conduct of the essential functions of another branch." *Massameno* v. *Statewide Grievance Committee*, supra, 234 Conn. 552–53; see also *Bartholomew* v. *Schweizer*,

217 Conn. 671, 676, 587 A.2d 1014 (1991); *State* v. *Darden*, 171 Conn. 677, 679, 372 A.2d 99 (1976).

In the present case, the plaintiffs are unable to demonstrate that the appointive power in Connecticut is exclusively under the control of the executive branch. Nor can they show that legislative appointment to the commission significantly interferes with the essential functions of the executive branch. The case law, in fact, suggests the opposite. For example, in *State* v. *Moynahan*, 164 Conn. 560, 567–71, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219 (1973), this court upheld a statute that provided for the appointment of state's attorneys by the judicial branch. Although state's attorneys are generally considered to exercise executive power, the court reasoned that they actually exercise both executive and judicial powers. Id., 568.

Similarly, powers exercised by members of the commission are not strictly executive. Commission duties and powers include, inter alia, levying civil penalties,[21] adopting regulations[22] and investigating alleged violations.[23] Thus, commission members participate in activities traditionally thought of as judicial, legislative and, of course, executive. The plaintiffs have failed to demonstrate that the actions exercised by the commission are exclusively dedicated to any one branch of govern-

[21] General Statutes § 9-7b (a) (2) provides in relevant part that the commission has the power "[t]o levy a civil penalty . . . ."

[22] General Statutes § 9-7b (a) (13) provides in relevant part that the commission has the power "[t]o adopt and publish regulations . . . and to make recommendations to the General Assembly concerning suggested revisions of the election laws . . . ."

[23] General Statutes § 9-7b (a) provides in relevant part: "The State Elections Enforcement Commission shall have the following duties and powers:

"(1) To make investigations on its own initiative or with respect to statements filed with the commission . . . with respect to alleged violations of any provision of the general statutes relating to any election or referendum . . . ."

ment. Moreover, the plaintiffs have not met their heavy burden to establish that the actions taken by the commission significantly interfere with any branch's ability to perform its duties. We therefore conclude that the composition of Connecticut's commission does not violate the separation of powers doctrine.

In sum, we conclude that § 9-333w (a) is constitutional, that the commission's handling of the complaints did not violate the plaintiffs' constitutional rights, and that the composition of the commission is not in violation of the separation of powers doctrine.

The judgment is affirmed.

In this opinion BORDEN and PALMER, Js., concurred.

MCDONALD, C. J., with whom SULLIVAN, J., joins, dissenting. This case involves a one page press release and a two page press release issued by the plaintiffs, Gabriel Seymour and Robert Reid, in which these candidates for the board of selectmen outlined their election platform and their proposals for political reform in the town of Canaan. The two releases were prepared by Seymour on her computer, and she faxed them to three newspapers. The names and telephone numbers of both plaintiffs were printed at the top of these releases. The expenditures incurred by the plaintiffs for the preparation and distribution of the news releases have not been calculated, but the record reflects that they were the cost of three pieces of paper and the ink used in printing the releases, and the cost (if any) of six local telephone calls—mere pennies.

The elections enforcement commission (commission) held that, because the press releases did not contain the words "paid for by" preceding the names and telephone numbers of the plaintiffs, the plaintiffs were

"in technical violation" of General Statutes § 9-333w (a).[1] The majority now affirms this ruling.

"Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people. . . . Although First Amendment protections are not confined to the exposition of ideas . . . there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs . . . of course includ[ing] discussions of candidates . . . . This no more than reflects our profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open . . . . In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation. As the Court [previously] observed . . . it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office. *Buckley* v. *Valeo*, 424 U.S. 1, 14–15 [96 S. Ct. 612, 46 L. Ed. 2d 659] (1976)

[1] General Statutes § 9-333w (a) provides: "No individual shall make or incur any expenditure with the cooperation of, at the request or suggestion of, or in consultation with any candidate, candidate committee or candidate's agent, and no candidate or committee shall make or incur any expenditure for any written, typed or other printed communication which promotes the success or defeat of any candidate's campaign for nomination at a primary or election or solicits funds to benefit any political party or committee unless such communication bears upon its face the words 'paid for by' and the following: (1) In the case of such an individual, the name and address of such individual; (2) in the case of a committee other than a party committee, the name of the committee and its campaign treasurer; or (3) in the case of a party committee, the name of the committee."

(per curiam)." (Citations omitted; internal quotation marks omitted.) *McIntyre* v. *Ohio Elections Commission*, 514 U.S. 334, 346–47, 115 S. Ct. 1511, 131 L. Ed. 2d 426 (1995). "When a law burdens core political speech, we apply 'exacting scrutiny,' and we uphold the restriction only if it is narrowly tailored to serve an overriding state interest." Id., 347. As noted by Justice Scalia in his dissent in *McIntyre*, this standard is ordinarily the "kiss of death." Id., 380.

The majority finds that four compelling state interests justify infringement upon this core political speech. First is the state's interest in preventing actual or perceived corruption. See *Nixon* v. *Shrink Missouri Government PAC*, 528 U.S. 377, 120 S. Ct. 897, 145 L. Ed. 2d 886 (2000). The evil is presented as postelection favors for the candidate's supporters. That reason simply does not exist in this case. Here, the candidate is spending her own money and less than $1.

Second, quoting *Buckley* v. *Valeo*, supra, 424 U.S. 67–68, the majority finds that the funding source requirement is " 'an essential means of gathering the data necessary to detect violations of the contribution limitations . . . .' " As required by *Buckley* v. *Valeo* supra, 52–54, however, and as provided in General Statutes § 9-333*l* (c),[2] there are no limits on the self-funding of campaigns. In this case there are no contribution limitations. As *Buckley* again points out, if discovering violations of campaign contributions by the candidate is the function of the funding disclosure, disclosure

---

[2] General Statutes § 9-333*l* (c) provides: "A candidate may make any expenditure permitted by section 9-333i to aid or promote the success of his campaign for nomination or election from his personal funds, or the funds of his immediate family, which for the purposes of this chapter shall consist of the candidate's spouse and issue. Any such expenditure shall not be deemed a contribution to any committee."

would not serve any governmental purpose in this case. Id., 76.[3]

The majority also finds that the provision ensures that the public will know who is the source of the press releases. In this case, the addition of the fact that the candidate herself funded the releases with pennies adds nothing to the public's ability to evaluate the message of those documents by knowing their source. See *McIntyre* v. *Ohio Elections Commission*, supra, 514 U.S. 334.

Last, the majority finds that the "paid for by" label may prevent libel and fraud. The candidate's name and address on the press release, however, fully serves this purpose. I fail to see how stating that the candidate herself prepared the release on her computer with her three pieces of paper and faxed them to the newspapers at her own small expense advances this claimed state interest. Simply put, none of the goals claimed by the commission are advanced by the application of the statute in this case.

In the words of the commission itself, this was a "technical violation" that, in ordinary English, translates into action that did not violate the substance of the election law.

The commission endangers vigorous political debate by straining at a gnat. Were it not for the real threat to grass roots political movements with modest resources and their right to reach the public's ears, this case would be laughable.

History teaches us that a stringent control of political debate on a minute formal point, without any relationship to the dangers of money controlling democratic

---

[3] "If the sole function of [the disclosure requirement] were to aid in the enforcement of [the independent expenditure ceiling, which was found to be unconstitutional], it would no longer serve any governmental purpose." *Buckley* v. *Valeo*, supra, 424 U.S. 76.

government, presents a grave threat to our liberties. A history of the use of disclosure laws against civil rights groups, detailed in such cases as *N.A.A.C.P.* v. *Alabama*, 357 U.S. 449, 78 S. Ct. 1163, 2 L. Ed. 2d 1488 (1958), illustrates how those in power may attempt to impede vigorous debate of political issues by the application of such laws.

We should remember the words of Benjamin Franklin when he was asked what kind of government we created in 1787. He replied, "A republic, if you can keep it." Respectfully Quoted (S. Platt ed., 1992) p. 299. Free elections and the vigorous debate essential to them are the essence of our republic. That is why freedom of speech was protected in the first amendment in 1791. Seymour's seeking public office against entrenched political parties in a small Connecticut town was entitled to protection from undue interference by the commission. I find the statute as applied violated that right.

I respectfully dissent.