AMERICAN CIVIL LIBERTIES UNION OF NEVADA; Gary Peck, Plaintiffs–Appellants,

v.

Dean HELLER, in his capacity as Secretary of State of the State of Nevada; Brian Sandoval, in his capacity as Attorney General of the State of Nevada; * State of Nevada, Defendants–Appellees.

No. 01–15462.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 15, 2002.

Submission Vacated June 4, 2002.

Resubmitted Dec. 18, 2003.

Filed Aug. 6, 2004.

---

* Brian Sandoval is substituted for his predecessor, Frankie Sue Del Papa, as Attorney General of Nevada. *See* Fed. R.App. P. 43(c)(2).

Allen Lichtenstein and JoNell Thomas, Las Vegas, NV, for the plaintiffs-appellants.

Kateri Cavin, Victoria Thimmesch Oldenburg, and Paul G. Taggart, Office of the Attorney General, Carson City, NV, for the defendants-appellees.

Before: BROWNING, HUG, JR., and BERZON, Circuit Judges.

BERZON, Circuit Judge:

Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind. Persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all.... Even the Federalist Papers, written in favor of the adoption of our Constitution, were published under fictitious names. It is plain that anonymity has sometimes been assumed for the most constructive purposes.

*Talley v. California,* 362 U.S. 60, 64–65, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960).

We are asked in this case to rule on the constitutionality of a Nevada statute that requires certain groups or entities publishing "any material or information relating to an election, candidate or any question on a ballot" to reveal *on the publication* the names and addresses of the publications' financial sponsors. After the district court found no constitutional infirmities, we remanded for a determination of plaintiffs' standing. Now satisfied that standing has been established, we hold that the statutory provision is facially unconstitutional because it violates the Free Speech Clause of the First Amendment, as explicated by *McIntyre v. Ohio Elections Commission,* 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995).

## BACKGROUND

Nevada Revised Statutes § 294A.320 [1] requires persons either paying for or "responsible for paying for" the publication of "any material or information relating to an election, candidate or any question on a ballot" to identify their names and addresses on "any [published] printed or written matter or any photograph." Advertising by candidates and political parties is exempted if the advertising refers only to a candidate and displays his or her name "prominently." In addition, if monies used for a publication have "been reported by the candidate as a campaign contribution," then he or she may approve and pay for that publication without being subject to the Nevada Statute's requirements.

In *McIntyre,* the Supreme Court addressed the validity of an Ohio statute prohibiting the distribution of written political communications unless the publica-

---

1. We refer to § 294A.320 in this opinion as "the Nevada Statute," or "the Statute."

tion contained the name and address "of the chairman, treasurer, or secretary of the organization issuing the same, or the person who issues, makes, or is responsible therefor." *McIntyre*, 514 U.S. at 338 n. 3, 115 S.Ct. 1511. Margaret McIntyre had distributed leaflets, attributed to "Concerned Parents and Tax Payers," regarding an "imminent" referendum on the school tax levy, which was scheduled to be discussed at the meeting. *Id.* at 337–38, 115 S.Ct. 1511. There was "no suggestion that the text of her message was false, misleading, or libelous.... Except for the help provided by her son and a friend, who placed some of the leaflets on car windshields in the school parking lot, Mrs.

McIntyre acted independently." *Id.* at 337, 115 S.Ct. 1511. The Court struck down Ohio's statutory provision, describing it as "a regulation of pure speech[,] ... a direct regulation of the content of speech." *Id.* at 345, 115 S.Ct. 1511.

In 1997, Nevada amended § 294A.320, originally enacted in 1989, in an effort to respond to *McIntyre*. The amendment added only an exception for "a natural person who acts independently and not in cooperation with or pursuant to any direction from a business or social organization, nongovernmental legal entity or governmental entity." Nev.Rev.Stat. § 294A.320(2)(c).[2]

---

2. The complete text of Nevada Revised Statutes § 294A.320 is as follows:

*Published material concerning campaign must identify person paying for publication; exceptions*

1. Except as otherwise provided in subsection 2, it is unlawful for any person to publish any material or information relating to an election, candidate or any question on a ballot unless that material or information contains:

(a) The name and mailing or street address of each person who has paid for or who is responsible for paying for the publication; and

(b) A statement that each such person has paid for or is responsible for paying for the publication.

2. The provisions of subsection 1 do not apply:

(a) To any candidate or to the political party of that candidate which pays for or is responsible for paying for any billboard, sign or other form of advertisement which refers only to that candidate and in which the candidate's name is prominently displayed.

(b) If the material is expressly approved and paid for by the candidate and the cost of preparation and publishing has been reported by the candidate as a campaign contribution pursuant to Nev.Rev.Stat. § 294A.120.

(c) To a natural person who acts independently and not in cooperation with or pursuant to any direction from a business or social organization, nongovernmental legal entity or governmental entity.

3. Any identification that complies with the requirements of the Communications Act of 1934 and the regulations adopted pursuant to the act shall be deemed to comply with the requirements of this section.

4. As used in this section:

(a) "Material" means any printed or written matter or any photograph.

(b) "Publish" means the act of:

(1) Printing, posting, broadcasting, mailing or otherwise disseminating; or

(2) Causing to be printed, posted, broadcasted, mailed or otherwise disseminated,

any material or information to the public. Nev.Rev.Stat. § 294A.320

For an example of how a "candidate for public office" could meet the identification requirements of the Communications Act of 1934, 47 U.S.C. § 151 *et seq.*, see 47 U.S.C. § 315(b)(2)(C):

A candidate meets the requirements of this subparagraph if, in the case of a television broadcast, at the end of such broadcast there appears simultaneously, for a period no less than 4 seconds—

(i) a clearly identifiable photographic or similar image of the candidate; and

(ii) a clearly readable printed statement, identifying the candidate and stating that the candidate has approved the broadcast and that the candidate's authorized committee paid for the broadcast.

The American Civil Liberties Union of Nevada and its executive director, Gary Peck, (together "ACLUN") brought this First Amendment facial overbreadth challenge to the Nevada Statute. The district court entered summary judgment in favor of the state defendants, reasoning that:

> This statute protects the integrity of the election process by promoting truthfulness in campaign advertising. This statute is also important in increasing the wealth of information available to the electorate. The State of Nevada's interest in preserving the integrity of the election process by preventing actual and perceived corruption has been found to be a compelling state interest by the United States Supreme Court.

The ACLUN appealed. In an unpublished order, we remanded the case because the pleadings and record did not demonstrate that the plaintiffs had standing to bring this suit.[3] On remand, the district court found that the ACLUN's Second Amended Complaint ("the Complaint") did establish Article III standing because the ACLUN alleged in the Complaint specific instances in which the organization wished to engage in speech but refrained from doing so for fear of being prosecuted under the Nevada Statute.

## ANALYSIS

### I

*Standing*

On the present record, the ACLU of Nevada, suing for itself and on behalf of its members, and Gary Peck, as one of its members, satisfy Article III standing requirements. Standing requires plaintiffs to demonstrate injuries that are "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (quotation marks and citation omitted). We recently explained in the First Amendment context that "it is sufficient for standing purposes that the plaintiff intends to engage in a course of conduct arguably affected with a constitutional interest and that there is a credible threat that the challenged provision will be invoked against the plaintiff." *Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003) (quotation marks and citation omitted); *see also Cal. Pro–Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094–95 (9th Cir.2003) (describing "the constitutionally recognized injury of self-censorship").

The present Complaint alleges that the Nevada Statute has "already prohibited and continues to restrict the protected speech of the ACLUN, its members, Gary Peck, and other parties," and provides examples of such restrictions. As found by the district court,

> the ACLUN indicated that its members wished to engage in anonymous speech—but did not on account of NRS 294A.320—with regard to an upcoming City of Las Vegas referendum concerning pay raises for the City Council and Mayor and a City of

---

**3.** Our order stated that the allegations in plaintiffs' Complaint were inadequate, as the Complaint posited only that: "Because the existence of NRS 294A.320 creates a chilling effect on the protected speech of the ACLUN, Gary Peck and other parties, a case and controversy exists for which the ACLUN has standing to bring suit." We noted the absence of an "allegation that any of the appellants have engaged in, intend to engage in, or would engage in but for the statute, any speech concerning an election or candidate, much less any speech covered by NRS § 294A.320. Nor is there any allegation that the ACLU is suing on behalf of its members, or that any of the ACLU's members can meet the injury in fact requirement."

North Las Vegas ballot initiative concerning public comment at City Council meetings. Specifically, ACLUN members wish to engage in coordinated efforts of anonymous political speech, that is, anonymous speech in conjunction with the social organization of which they are a part, which is prohibited by NRS 294A.320. [ . . . ]

Similarly, ACLUN members had wanted to engage in the production and distribution of anonymous political flyers on various ballot initiatives in the 2002 election but did not for fear of prosecution under NRS 294A.320. The ACLUN also demonstrated that its members have previously been prosecuted for violations of the statute.

The Complaint states that the ACLUN was prevented from anonymous "involvement with literature concerning ballot initiatives," because, "[u]nder NRS 294A.320, it would have been unlawful for the ACLUN to be involved with[groups opposing a 2002 Las Vegas redistricting plan] in a public information campaign concerning this issue, as it related to the upcoming election, unless the ACLUN had its name on all written material dispensed to the public."

Plaintiffs also introduced affidavits by Peck and another ACLUN member, Tom Skancke, who was "prosecuted for violations of NRS 294A.320." Peck's affidavit describes, with reference to recent Nevada elections and ballot initiatives, his "wish . . . contrary to the provisions of NRS 294A.320, to involve [himself] with organizations speaking out on [a ballot initiative] issue, including the production and distribution of flyers, without attaching [his] name [so as not to create an appearance that his personal opinion represents the official position of the ACLUN]." Peck added that "ACLUN members who have

. . . expressed a desire to engage in anonymous political speech . . . wish to do so not only as natural persons acting independently, but also as participants acting in concert and cooperation [with] other persons and groups, as prohibited by [NRS 294A.320]."

The Complaint also alleges an intent to continue to engage in conduct barred by the Nevada Statute in the future. The Complaint states that "[t]he ACLUN and its members have also been involved with various groups who have in the past, *and plan in the future*, to circulate petitions to place certain referendum measures on statewide or local ballots," and that "NRS 294A.320 has *and continues to* discourage ACLUN and its members from engaging in anonymous political speech critical of elected officials and of the election process itself." (Emphases added). As a result, alleges the Complaint, "the ACLUN and its members *will continue* to be forced to choose to self-censor . . . concerning past and present matters, but also those that will inevitably *arise in the future*." (Emphases added).

■ In First Amendment cases, "[i]t is sufficient for standing purposes that the plaintiff intends to engage in a course of conduct arguably affected with a constitutional interest and that there is a credible threat that the challenged provision will be invoked against the plaintiff." *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1154–55 (9th Cir. 2000). The Complaint meets that standard.

Both the ACLUN, as an organization and on behalf of its members, and Peck, one of its members, have thus alleged "concrete and particularized" injury stemming from the challenged statute. *See Lujan*, 504 U.S. at 560, 112 S.Ct. 2130; *see also Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("There is no question that an association may have

standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy."). The Complaint's description of the ACLUN's encounters and those of its members with the challenged Nevada statutory provision therefore amply justify the district court's standing determination.

## II

### *Narrowing Construction*

Nevada argues that § 294A.320 should be construed to apply only to "express advocacy." Such a limited interpretation, Nevada contends, would cure any over-breadth concerns. Relying on our decision in *FEC v. Furgatch*, 807 F.2d 857 (9th Cir.1987), the state regards "express advocacy" as "that speech which is directed to influence a particular outcome of an election, as opposed to issue advocacy that focuses on the merits of a particular issue without regard for an election outcome." *Furgatch's* definition of "express advocacy" as the term appears in the Federal Election Campaign Act of 1971 (FECA), 2 U.S.C. § 431 *et seq.*, included speech that "must, when read as a whole, and with limited reference to external events, be susceptible of no other reasonable interpretation but as an exhortation to vote for or against a specific candidate." 807 F.2d at 864.

Nevada's argument was made before the Supreme Court's decision in *McConnell v. FEC*, 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003). *McConnell* stated that, despite the emphasis on "express advocacy" in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), with regard to the scope of the reporting and disclosure requirements of FECA, "the express advocacy restriction was an endpoint

of statutory interpretation, not a first principle of constitutional law." *McConnell*, 124 S.Ct. at 687. After *McConnell*, the line between "express" and all other election-related speech is not constitutionally material, as the Court was not persuaded that "the First Amendment erects a rigid barrier between express advocacy and so-called issue advocacy." *Id.* at 688–89; *see also id.* at 689 (rejecting "the notion that the First Amendment requires Congress to treat so-called issue advocacy differently from express advocacy").

■ A limitation of the Nevada Statute to "express advocacy," whether defined in accord with our decision in *Furgatch*, or more narrowly, *see Cal. Pro-Life Council, Inc.*, 328 F.3d at 1097–98 (discussing the distinction between the "magic words" and the *Furgatch* approaches to defining "express advocacy"), would therefore likely not have any determinative impact on our evaluation of the statute's constitutional validity. Nevertheless, as stated recently by the Sixth Circuit, *McConnell* "left intact the ability of courts to make distinctions between express advocacy and issue advocacy, where such distinctions are necessary to cure vagueness and over-breadth in statutes which regulate more speech than that for which the legislature has established a significant governmental interest." *Anderson v. Spear*, 356 F.3d 651, 664–65 (6th Cir.2004). By addressing Nevada's proffered limitation of the statute's reach to express advocacy, we can begin to illuminate the narrow tailoring concerns that will recur in this opinion. We therefore start by responding to Nevada's contentions that this court should apply a narrowing construction of § 294A.320, or, alternatively, that it is appropriate for us to certify the question to the Nevada Supreme Court.[4]

4. The state suggests the following wording for a certification request: "Whether the use of

■ Federal courts are "without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent." *Stenberg v. Carhart,* 530 U.S. 914, 944, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000) (quoting *Boos v. Barry,* 485 U.S. 312, 330, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988)). According to its text, the Nevada Statute applies to "any material or information relating to an election, candidate or any question on a ballot." An interpretation of this language to apply only to express advocacy concerning a candidate or ballot question is not "readily apparent" from the statute itself. The language of § 294A.320 is not limited to "advocacy," much less "express advocacy."

The Nevada Statute applies to "information," not a term that suggests any kind of exhortation to action. "Information" has been understood in constitutional jurisprudence to refer to matters of fact rather than advocacy. *See, e.g., Schneider v. New Jersey,* 308 U.S. 147, 161, 60 S.Ct. 146, 84 L.Ed. 155 (1939) (repeatedly using the phrase "information or opinion," as in "the freedom to speak, write, print or distribute information or opinion").

The Nevada Statute, moreover, applies to "material or information *relating to* an election, candidate or any question on a ballot." (Emphasis added). As such, the language reaches objective publications that concern any aspect of an election, candidate, or ballot question—including, for example, discussions of election procedures, analyses of polling results, and non-partisan get-out-the-vote drives, such as those conducted by the League of Women Voters.

Further, other provisions of Nevada Revised Statutes Title 24, "Elections," make clear that the Legislature explicitly uses language to indicate a limitation to advocacy speech when it intends such a limitation. *See, e.g.,* Nev.Rev.Stat. §§ 294A.004 (referring in part to "expenditures made . . . to advocate expressly the election or defeat of a clearly identified candidate or group of candidates"); 294A.150 (regulating "[e]very person or group of persons organized formally or informally who advocates the passage or defeat of a question or group of questions on the ballot"); 294A.220 (same). The existence of these provisions provides context for our reading of § 294A.320, which is conspicuous in its failure to contain such limiting language.

■■ We therefore cannot adopt a construction of the statute limiting its reach to express *advocacy,* however advocacy is defined. For similar reasons, we also decline to certify a question to the Nevada Supreme Court. "Certification of a question . . . is appropriate only where the statute is 'fairly susceptible' to a narrowing construction." *Stenberg,* 530 U.S. at 945, 120 S.Ct. 2597. As already discussed, the Nevada Statute is not so susceptible.[5]

the phrase 'relating to an election, candidate or any question on a ballot' in NRS 294A.320 limits the application of that statute to political speech that expressly advocates the election or defeat of a particular candidate, or the passage or defeat of a particular ballot question."

5. Nevada points to two other circuits that have certified "the very same question." The statutory language at issue in those cases, however, was entirely different from that which we confront. Contested before *McCon-*

*nell,* the statutes referred to "influencing"— not "relating to"—a candidate or election, and did not expressly encompass "information." These statutes were thus amenable to a narrowing construction. *See Brownsburg Area Patrons Affecting Change v. Baldwin,* 137 F.3d 503, 510 (7th Cir.1998) ("to influence the election of a candidate . . . or the outcome of a public question"); *Va. Soc'y for Human Life, Inc. v. Caldwell,* 152 F.3d 268, 269 (4th Cir.1998) ("for the purpose of influencing the outcome of an election for public office").

The Nevada Statute's language indicates clearly what the Legislature sought to accomplish. That language is not fairly susceptible to the narrowing construction proposed by Nevada, and the question of an "express advocacy" limitation, even if it is relevant after *McConnell*, is not one that is appropriate to certify to the Nevada Supreme Court. *See Stenberg*, 530 U.S. at 945, 120 S.Ct. 2597. We therefore decline to construe the Nevada Statute to encompass only "express advocacy," or to certify the issue to the Nevada Supreme Court.

## III

### *The First Amendment*

■ Critical to our First Amendment analysis, as will appear, is the central similarity between this case and *McIntyre:* Both involve campaign statutes that go beyond requiring the reporting of funds used to *finance* speech to affect the *content of the communication itself.* This case and *McIntyre* therefore involve governmental proscription of the speech itself unless it conforms to prescribed criteria. This distinction between direct regulation of the content of political speech and requiring the later reporting of the funding of speech has not always been given weight in some of the post-*McIntyre* case law.[6] Yet while the Supreme Court's recent opinion in *McConnell* casts new light on some other aspects of the First Amendment principles applicable to regulation of election-related speech, nothing in *McConnell* undermines *McIntyre's* understanding that proscribing the *content* of an election communication is a form of regulation of campaign activity subject to traditional strict scrutiny.[7] We therefore begin with

---

*Brownsburg Area Patrons* is also inapposite because it concerned an after-the-fact reporting statute, not an on-publication identity disclosure requirement such as the one here at issue.

The decision in *Majors v. Abell* (*Majors I*), 317 F.3d 719 (7th Cir.2003), certifying a question to the Indiana Supreme Court is consistent with our analysis. In *Majors I*, a case in which the state of Indiana advocated a narrowing construction, the Seventh Circuit agreed to certify a question concerning statutory language. *Id.* at 724–25. The statute "requires that political advertising that 'expressly advocat[es] the election or defeat of a clearly identified candidate' include 'adequate notice of the identity of persons who paid for ... the communication.' " *Id.* at 721 (alteration in original). Confronted with the issue of whether the term "persons" is "limited to candidates, authorized political committees or subcommittees of candidates, and the agents of such committees or subcommittees," *id.* at 725, the Indiana Supreme Court declined to adopt such a narrowing construction: "If we construe the statute as the State suggests, we agree it removes most doubt as to the constitutionality of the statute, but we think it also eliminates most of what the statute was seeking to accomplish." *See Majors*

*v. Abell*, 792 N.E.2d 22, 29 (Ind.2003). As a result, the Seventh Circuit, in the end, did have to decide the constitutionality of the statute at issue in *Majors II. See Majors v. Abell* (*Majors II*), 361 F.3d 349, 355 (7th Cir.2004). Certifying a statutory question to the state Supreme Court when the statute was not fairly open to the proffered interpretation thus accomplished nothing but delay.

6. *See* discussion of *Majors II, infra* at 1001–1002.

7. *McConnell* did not decide the validity of Bipartisan Campaign Reform Act ("BCRA") § 305(a)(3), which amended 47 U.S.C. § 315(b) to require identification of broadcast advertisements of candidate sponsorship in very limited circumstances. *See McConnell*, 124 S.Ct. at 708 ("Because we hold that the McConnell plaintiffs lack standing to challenge § 305, we affirm the District Court's dismissal of the challenge to BCRA § 305.").

Nor did *McConnell* address the constitutionality of Federal Election Campaign Act ("FECA") § 318, which "requires that certain communications 'authorized' by a candidate or his political committee clearly identify the candidate or committee or, if not so authorized, identify the payor and announce the lack

*McIntyre*, which remains fully governing law.

After noting and explicating the "respected tradition of anonymity in the advocacy of political causes," *McIntyre*, 514 U.S. at 343, 115 S.Ct. 1511, *McIntyre* underscored that "the speech in which Mrs. McIntyre engaged—handing out leaflets in the advocacy of a politically controversial viewpoint—is the essence of First Amendment expression." *Id.* at 347, 115 S.Ct. 1511. "No form of speech is entitled to greater constitutional protection than Mrs. McIntyre's." *Id.* Requiring a political communication to contain information concerning "the identity of the speaker" is "no different from [requiring the inclusion of] other components of the document's content that the author is free to include or exclude." *Id.* at 348, 115 S.Ct. 1511.

*McIntyre* then explained that there are two distinct reasons why forbidding anonymous political speech is a serious, direct intrusion on First Amendment values: First,"[t]he decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible." *Id.* at 341–42, 115 S.Ct. 1511. Second,

> an advocate may believe her ideas will be more persuasive if her readers are unaware of her identity. Anonymity thereby provides a way for a writer who may be personally unpopular to ensure that readers will not prejudge her message simply because they do

not like its proponent. Thus, even in the field of political rhetoric, where 'the identity of the speaker is an important component of many attempts to persuade,' *City of Ladue v. Gilleo*, 512 U.S. 43, 56, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) [footnote omitted], the most effective advocates have sometimes opted for anonymity.

*Id.* at 342–43, 115 S.Ct. 1511. We, too, following *McIntyre*, have recognized that "[d]epriving individuals of this anonymity is ... 'a broad intrusion, discouraging truthful, accurate speech by those unwilling to [disclose their identities] and applying regardless of the character or strength of an individual's interest in anonymity.'" *Wash. Initiatives Now! v. Rippie*, 213 F.3d 1132, 1138 (9th Cir.2000) (quoting *Am. Const. Law. Found. v. Meyer*, 120 F.3d 1092, 1103 (10th Cir.1997)) (second alteration in original).

The Nevada Statute here at issue is, in almost all pertinent respects, similar to the statute invalidated in *McIntyre*. Indeed, in one important way the Nevada Statute before us is broader in restricting speech than the Ohio statute at issue in *McIntyre*: The Nevada Statute, like the Ohio statute, covers both candidate and issue elections, but the Ohio statute was limited to publications "designed to promote the nomination or election or defeat of a candidate or to promote the adoption or defeat of any issue, or to influence the voters in any election ...." *McIntyre*, 514 U.S. at 338 n. 3, 115 S.Ct. 1511. The Nevada Statute, in contrast, reaches "*any* material or infor-

---

of authorization," *see* 124 S.Ct. at 710, because "challenges to the constitutionality of FECA provisions are subject to direct review before an appropriate en banc court of appeals, as provided in 2 U.S.C. § 437h, not in the three-judge District Court convened pursuant to BCRA § 403(a)." 124 S.Ct. at 709. In this regard, *McConnell* stated with respect to BCRA § 311's addition of "electioneering

communications" to FECA § 318's disclosure requirement only that: "Assuming as we must that FECA § 318 is valid to begin with, and that FECA § 318 is valid as amended by BCRA § 311's amendments other than the inclusion of electioneering communications, the challenged inclusion of electioneering communications is not itself unconstitutional." *Id.* at 710.

mation relating to an election, candidate or any question on a ballot...." Nev.Rev. Stat. § 294A.320(1) (emphasis added). Nevada nonetheless maintains that there are sufficient differences in coverage and purpose to render the Nevada Statute valid, *McIntyre* notwithstanding. We disagree.

a. McIntyre *and the Individual*

Nevada's primary submission is that, because the Statute now contains an exemption for a natural person acting independently and without the cooperation of, *inter alia,* "any business or social organization," it would not apply to the fact situation in *McIntyre* and is therefore constitutional.

The Court in *McIntyre* did stress the particular harshness of Ohio's punishment of McIntyre as the sole advocate for her cause. But nothing in the decision indicates that if she had been allied with other individuals, or with a "business or social organization," the result would have been different. The anonymity protected by *McIntyre* is not that of a single cloak.

Although we do not think the precise scope of the "natural person" exception in the Nevada Statute is of dispositive import, it is worth noting at the outset that it is exceedingly narrow. First, the exception applies only to "*a* natural person," acting *both* "independently" *and* "not in cooperation with or pursuant to any direction from" several kinds of organizations and entities. So two or more individuals working together, although not in conjunction with any organization, are required to disclose their identities on any election-related publication, as is a single individual cooperating with an organization.

Second, as defined in the statute, a "business or social organization" is distinct from a "nongovernmental legal entity."

Nev.Rev.Stat. §§ 294A.009(2) & (3) (defining "person" to include "(2) [a]ny form of business or social organization" or "(3) [a]ny nongovernmental legal entity"). The latter is defined as "including, without limitation, a corporation, partnership, association, trust, unincorporated organization, labor union, committee for political action, political party and committee sponsored by a political party...." *Id.* at § 294A.009(3). As most formal or permanent groups of individuals could be described as "association[s]" and "unincorporated organization[s]," the separate category, "any form of business or social organization," must cover temporary and informal, loosely affiliated groups.

The reasons given by *McIntyre* for protecting anonymous speech apply regardless of whether an individual, a group of individuals, or an informal "business or social organization" is speaking. Two or more individuals working together or with informal "social organizations" or more formal associations can harbor "fear of economic or official retaliation, [or] concern about social ostracism," *McIntyre,* 514 U.S. at 341–42, 115 S.Ct. 1511, just as can lone individuals.

Similarly, just as a lone "advocate may believe her ideas will be more persuasive if her readers are unaware of her identity," because readers may otherwise "prejudge her message simply because they do not like its proponent," *id.* at 342–43, 115 S.Ct. 1511 (citation omitted), so, too, groups or individuals working in cooperation with groups may be concerned about readers prejudging the substance of a message by associating their names with the message. In fact, groups are more likely to be associated with a certain viewpoint than are individuals (e.g., Greenpeace, the ACLU, the National Rifle Association). So a particular group's concern that its message may be prejudged based on its association

with the group could be even more well-founded than an individual's similar concern. Anonymity may allow speakers to communicate their message when preconceived prejudices concerning the message-bearer, if identified, would alter the reader's receptiveness to the substance of the message. Like other choice-of-word and format decisions, the presence or absence of information identifying the speaker is no less a content choice for a group or an individual cooperating with a group than it is for an individual speaking alone.

The Court in *McIntyre* also recognized that the choice to speak anonymously may be motivated by "a desire to preserve as much of one's privacy as possible." *Id.* at 341–42, 115 S.Ct. 1511; *see also id.* at 355, 115 S.Ct. 1511 ("A written election-related document—particularly a leaflet—is often a personally crafted statement of a political viewpoint.... [I]dentification of the author against her will is particularly intrusive; it reveals unmistakably the content of her thoughts on a controversial issue."). This basis for protecting anonymous speech does not apply as clearly to groups as it does to individuals. A group as a whole lacks the same "personal[ ]" interest in its "thoughts." *Id.* at 355, 115 S.Ct. 1511. Nonetheless, the fact that *individuals* in a group, or an individual cooperating with a group, have shared their political thoughts with the members of the group does not mean that they have *no* privacy interest in concealing from the general public their endorsement of those beliefs. This observation has particular force when the group is small enough that readers will associate individual members with the thoughts conveyed. Exposing the identity of the group publishing its views, or of an individual publishing the views of a group, thus infringes to some degree on the privacy interests of the individuals affiliated with the group.[8]

Finally, although the Court in *McIntyre* referred to "individuals acting independently and using only their own modest resources," 514 U.S. at 351, 115 S.Ct. 1511, we think it doubtful that the court used "independently" to mean "individually." That would have been redundant. "Independence," in this context of campaign regulation, usually refers to the absence of ties between someone like McIntyre (or ten allied McIntyres) and a political campaign. *See, e.g.,* 2 U.S.C. § 431(17) ("The term 'independent expenditure' means an expenditure by a person—(A) expressly advocating the election or defeat of a clearly identified candidate; and (B) that is not made in concert or cooperation with or at the request or suggestion of such candidate, the candidate's authorized political committee, or their agents, or a political party committee or its agents."). As to "modest resources," the Nevada Statute has no financial threshold; it requires identification of the person who "paid for or … is responsible for the publication," even if the only cost is for paper, pen, and ink; and it applies even where "a natural person" pays for the publication, if that person cooperates with "a business or social organization" in doing so.

In short, the Nevada Statute, like the Ohio statute in *McIntyre,* applies to circumstances in which the interests in circulation of anonymous communications are at their strongest. We therefore reject Nevada's proposed limitation of the holding in *McIntyre* to communications for which an

---

8. Our reading of *McIntyre* to include groups is reinforced in light of freedom of association protections. *See NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 462, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) ("Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs.").

individual working entirely alone is responsible.[9]

b. *Government Interests in Regulating Speech*

Quite aside from the suggestion that the "natural person" exception saves the Statute, the state maintains that its interests are different from and stronger than those relied upon by Ohio in *McIntyre*. We have considered carefully Nevada's submissions, as well as the post-*McIntyre* case law upon which Nevada relies, *McConnell* included. Although the post-*McIntyre* cases, including *McConnell*, indicate a fairly wide berth for state reporting and disclosure statutes promoting interests similar to those upon which Nevada here relies, those later cases do not support the validity of a *McIntyre*-clone statute based on the asserted governmental interests Nevada asks us to consider.

The constitutionally determinative distinction between on-publication identity disclosure requirements and after-the-fact reporting requirements has been noted and relied upon both by the Supreme Court and by this Circuit. In *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999), for example, the Supreme Court was presented with a challenge to Colorado's regulation of initiative-petition circulators. One of the challenged provisions required paid circulators to wear an identification badge, indicating the circulator's name and the name and number of the circulator's employer. *Id.* at 188 n. 5, 119 S.Ct. 636. The State's interest in requiring the badges was to "enable[ ] the public to identify, and the State to

apprehend, petition circulators who engage in misconduct." *Id.* at 198, 119 S.Ct. 636. A second provision, not challenged in the Supreme Court, required each circulator to complete and attach an affidavit to every petition, stating, among other information, the circulator's name and address. *Id.* at 189 n. 7, 119 S.Ct. 636. This affidavit was then filed with the secretary of state along with the completed petition. *Id.* at 188 n. 4, 119 S.Ct. 636.

■ Although both provisions required the circulator to reveal his or her name, the Court struck down the badge requirement, contrasting it with the affidavit requirement:

> While the affidavit reveals the name of the petition circulator and is a public record, it is tuned to the speaker's interest as well as the State's. Unlike a name badge worn at the time a circulator is soliciting signatures, the affidavit is separated from the moment the circulator speaks.... [T]he name badge requirement forces circulators to reveal their identities at the same time they deliver their political message; it operates when reaction to the circulator's message is immediate and may be the most intense, emotional, and unreasoned. The affidavit, in contrast, does not expose the circulator to the risk of heat of the moment harassment.

*Id.* at 198–99, 119 S.Ct. 636 (internal quotations and citations omitted). In other words, it is not just *that* a speaker's identity is revealed, but how and when that identity is revealed, that matters in a First Amendment analysis of a state's regulation of political speech. *See, e.g., Wash. Initiatives Now!*, 213 F.3d at 1138 ("Even when

---

9. We do not decide whether the preclusion of anonymous political communications could be valid if limited to corporations, as suggested in *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 778 n. 13, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), given the greater attenuation in privacy interests involved in the highly-regulated corporate form. The Nevada Statute is not so limited.

it does not have the effect of facilitating harassment, the [requirement of disclosure of the names and addresses of paid circulators] chills speech by inclining individuals toward silence.").

This distinction between requiring a speaker to reveal her identity while speaking and requiring her to reveal it in an after-the-fact reporting submission to a governmental agency was also recognized in *McIntyre*. There, the Supreme Court noted:

> True, in [a] portion of the *Buckley* [*v. Valeo* ] opinion we expressed approval of a requirement that "independent expenditures" in excess of a threshold level be reported to the Federal Election Commission. But that requirement entailed nothing more than an identification to the Commission of the amount and use of money expended in support of a candidate. Though such mandatory reporting undeniably impedes protected First Amendment activity, the intrusion is a far cry from compelled self-identification on all election related writings. A written election-related document—particularly a leaflet—is often a personally crafted statement of a political viewpoint.... As such, identification of the author against her will is particularly intrusive; it reveals unmistakably the content of her thoughts on a controversial issue. Disclosure of an expenditure and its use, without more, reveals far less information. It may be information that a person prefers to keep secret, and undoubtedly it often gives away something about the spender's political views. Nonetheless, even though money may "talk," its speech is less specific, less personal, and less provocative than a handbill—and as a result, when money supports an unpopular viewpoint it is less likely to precipitate retaliation.

514 U.S. at 355, 115 S.Ct. 1511. *See also Cal. Pro–Life Council, Inc.*, 328 F.3d at 1104 (citing *McIntyre* and noting the "distinction between prohibiting the distribution of anonymous literature and the mandatory disclosure of campaign-related *expenditures and contributions* " (emphasis in original)).

 As these precedents indicate, requiring a publisher to reveal her identity on her election-related communication is considerably more intrusive than simply requiring her to report to a government agency for later publication how she spent her money. The former necessarily connects the speaker to a particular message directly, while the latter may simply expose the fact that the speaker spoke. *See Majors II*, 361 F.3d at 353 (recognizing that the statutory provisions requiring mandatory identification related to "electioneering communications" that *McConnell* upheld "do[ ] not even require identifying the specific ads financed by the reporting contributor"). Statutes like the one here at issue and the Ohio statute in *McIntyre*, consequently, must be, and have been, viewed as serious, content-based, direct proscription of political speech: If certain content appears on the communication, it may be circulated; if the content is absent, the communication is illegal and may not be circulated.

 As a content-based limitation on core political speech, the Nevada Statute must receive the most "exacting scrutiny" under the First Amendment. *McIntyre*, 514 U.S. at 346, 115 S.Ct. 1511 (quoting *Meyer v. Grant*, 486 U.S. 414, 420, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988)); *see also McConnell*, 124 S.Ct. at 658 (citing *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988), for the proposition that a regulation that "alters or impairs the political message" is subject to strict scrutiny). Such

restriction will survive strict scrutiny only if "it is narrowly tailored to serve an overriding state interest." *McIntyre,* 514 U.S. at 357, 115 S.Ct. 1511. More specifically, "a content-based regulation of constitutionally protected speech must use the least restrictive means to further the articulated interest." *Foti v. City of Menlo Park,* 146 F.3d 629, 636 (9th Cir.1998).

Nevada offers three pertinent state interests, contending that they are sufficiently compelling to justify § 294A.320's restrictions, and that the Statute is sufficiently narrowly tailored to further these interests. Nevada argues that: (1) "[w]hether the identity of the author would help evaluate the usefulness of the information makes [this] case different from *McIntyre;* " (2) *McIntyre* "left open the possibility that preventing fraud and libel may be a valid compelling interest during the course of an election;" and (3) the state's interest in the enforcement of "disclosure and contribution election laws" is furthered by § 294A.320. We examine these three governmental interests in turn, with particular attention to the details of Nevada's overall scheme of regulating election campaigns.

### i. *Information*

Nevada argues that § 294A.320 is justified as a measure to aid prospective voters in evaluating information provided to them. In *McIntyre,* the Court firmly rejected Ohio's proffered justification that its statute served the purpose of more thoroughly informing the electorate than would otherwise be the case:

> The simple interest in providing voters with additional relevant information does not justify a state requirement that a writer make statements or disclosures she would otherwise omit. Moreover, in the case of a handbill written by a private citizen who is not known to the

recipient, the name and address of the author add little, if anything, to the reader's ability to evaluate the document's message. Thus, Ohio's informational interest is plainly insufficient to support the constitutionality of its disclosure requirement.

*McIntyre,* 514 U.S. at 348–49, 115 S.Ct. 1511.

We perceive no relevant distinction between *McIntyre* and this case that would support the constitutionality of the Nevada Statute on the ground that the Statute, as the state claims, "foster[s] an informed electorate." In fact, the impact of the Statute may be quite the opposite. The premise of *McIntyre* is that if anonymous speech is banned, some useful speech will go unsaid. Given the breadth of the Nevada Statute's coverage—in particular, its inclusion of "information related to" an election—this likely result is all the more serious. As the ACLUN correctly points out, under the Statute, "[a]nonymous statements, even if true, that allege voter disenfranchisement or bias in how different voters are treated are banned by the Nevada law." The result could be a worse-informed, not a better-informed, electorate.

That the Nevada Statute contains a "natural person" exception does not affect this *McIntyre*-based analysis, for two reasons:

*First,* the Nevada Statute still requires individual private citizens who publish any election-related material in cooperation with an organization or governmental or nongovernmental entity to include their names and addresses. An ACLU member, for example, who discusses an issue before the electorate on a ballot initiative at an ACLU meeting and then volunteers to compose, publish, and circulate a flyer concerning the organization's views on the matter is required to put *her* name, not the

ACLU's, on the document. *See* Nev.Rev. Stat. § 294A.320(1)(a)-(b). That a certain, unknown individual supplied the paper, computer, and time involved in producing a given communication "add[s] little, if anything, to the reader's ability to evaluate the document." *McIntyre*, 514 U.S. at 348–49, 115 S.Ct. 1511.

*Second*, in many instances, requiring publishers to include the names of business or social organizations or legal entities responsible for publishing an election-related communication is unlikely to supply much useful information. As the Court noted in *McConnell*, individuals and entities interested in funding election-related speech often join together in ad hoc organizations with creative but misleading names. 124 S.Ct. at 651 n. 23 (listing examples of such "mysterious" sponsors of issue ads as "American Family Voices" and "Coalition to Make Our Voices Heard"). While reporting and disclosure requirements can expose the actual contributors to such groups and thereby provide useful information concerning the interests supporting or opposing a ballot proposition or a candidate, simply supplying the name and address of the organization on the communication itself does not provide useful information—and that is all the Nevada Statute requires.

Moreover, and more fundamentally, one premise of *McIntyre* and the line of First Amendment cases concerning anonymous speech upon which *McIntyre* relies is that, far from enhancing the reader's evaluation of a message, identifying the publisher can interfere with that evaluation by requiring the introduction of potentially extraneous information at the very time the reader encounters the substance of the message. As *McIntyre* stated after reviewing the illustrious role of anonymous (and pseudonymous) communications in our history and that of other nations: "Of course, the identity of the source is helpful in evaluating ideas. But the best test of truth is the power of the thought to get itself accepted in the competition of the market." 514 U.S. at 348 n. 11, 115 S.Ct. 1511 (quotation marks and citations omitted). "The simple interest in providing voters with additional relevant information does not justify a state requirement that a writer make statements or disclosures she would otherwise omit." *Id.* at 348, 115 S.Ct. 1511.

We reiterate that *McIntyre's* evaluation of the inadequacy of a pure information rationale, and ours, pertain only to requirements that the disclosure be included on the communication itself. Campaign regulation requiring off-communication reporting of expenditures made to finance communications does not involve the direct alteration of the content of a communication. Such reporting requirements also serve considerably more effectively the goal of informing the electorate of the individuals and organizations supporting a particular candidate or ballot proposition. *See, e.g., Cal. Pro–Life Council, Inc.*, 328 F.3d at 1107 (suggesting that "California may well have a compelling interest in informing its voters of the source and amount of funds expended on express ballot-measure advocacy" via contribution and expenditure reporting requirements). Compared to communication-altering requirements such as the one imposed by the Nevada Statute, the imposition on freedom of speech of such reporting requirements is less, while the fit between the regulation and the interest it serves is superior.

That reporting and disclosure requirements have been consistently upheld as comporting with the First Amendment based on the importance of providing information to the electorate therefore supports rather than detracts from our conclusion that *McIntyre's* rejection of the additional information rationale remains

binding on us. *See Buckley v. Am. Const. Law Found.*, 525 U.S. at 198, 119 S.Ct. 636 ("This notarized submission [stating the names of petition circulators], available to law enforcers, renders *less* needful the State's provision for personal names on identification badges." (Emphasis added)). The availability of the less speech-restrictive reporting and disclosure requirement confirms that a statute like the one here at issue cannot survive the applicable narrow tailoring standard.

The state's first claimed interest supporting § 294A.320 is therefore not sufficiently compelling to justify the Nevada Statute.

ii. *Fraud*

Nor does Nevada's interest in combating "sham advocacy" justify § 294A.320, in light of *McIntyre*. The Nevada Statute, like the Ohio provision struck down in *McIntyre*, covers both true and false speech, relating to both candidate and ballot elections.

In *McIntyre*, Ohio's representations regarding its fraud interest were inadequate to render the considerably narrower statute there at issue constitutional:

> Ohio has not shown that its interest in preventing the misuse of anonymous election-related speech justifies a prohibition of all uses of that speech.

The State may, and does, punish fraud directly. But it cannot seek to punish fraud indirectly by indiscriminately outlawing a category of speech, based on its content, with no necessary relationship to the danger sought to be prevented. One would be hard pressed to think of a better example of the pitfalls of Ohio's blunder-buss approach than the facts of the case before us.

*Id.* at 357, 115 S.Ct. 1511; *see also Riley v. Nat'l Fed'n of the Blind,* 487 U.S. 781, 795, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) ("In striking down this portion of the Act, we do not suggest that States must sit idly by and allow their citizens to be defrauded. North Carolina has an antifraud law, and we presume that law enforcement officers are ready and able to enforce it. Further, North Carolina may constitutionally require fundraisers to disclose certain financial information to the State.... If this is not the most efficient means of preventing fraud, we reaffirm simply and emphatically that the First Amendment does not permit the State to sacrifice speech for efficiency." (Citation omitted)).

*McIntyre* did recognize that during election campaigns, the "state interest in preventing fraud and libel ... carries special weight." 514 U.S. at 349, 115 S.Ct. 1511.[10]

---

10. Like Ohio, Nevada has a separate statute prohibiting the "publication of certain false statements of fact" concerning a candidate. Nev.Rev.Stat. § 294A.345(1). This provision, which is not challenged before us, states:

> 1. A person shall not, with actual malice and the intent to impede the success of the campaign of a candidate, impede the success of the candidate by causing to be published a false statement of fact concerning the candidate, including, without limitation, statements concerning:
>
> (a) The education or training of the candidate.
>
> (b) The profession or occupation of the candidate.

(c) Whether the candidate committed, was indicted for committing or was convicted of committing a felony or other crime involving moral turpitude, dishonesty or corruption.

(d) Whether the candidate has received treatment for a mental illness.

(e) Whether the candidate was disciplined while serving in the military or was dishonorably discharged from service in the military.

(f) Whether another person endorses or opposes the candidate.

But the Court prohibited Ohio from using on-communication identity disclosure regulations during election campaigns "as an aid to enforcement of the specific prohibitions and as a deterrent to the making of false statements by unscrupulous prevaricators." *Id.* at 350–51, 115 S.Ct. 1511.

In any event, the Nevada Statute is *not* limited to speech "during election campaigns when false statements, if credited, may have serious adverse consequences for the public at large." *McIntyre,* 514 U.S. at 349, 115 S.Ct. 1511. As the state itself noted, § 294A.320 would have prevented an anonymous mailing "many months before a general election" in response to an elected official's vote in favor of a casino. Nevada's representation demonstrates that speech subject to the statute's compelled self-identification requirement can be far removed from the thrust and parry of election campaigns. Instead, the Nevada Statute could prevent speech well before, and long after, a campaign is underway. *Cf. McConnell,* 124 S.Ct. at 674–75 (finding certain statutory provisions applying to "activity that occurs within 120 days before a federal election" "reasonably tailored, with various *temporal* and substantive limitations designed to focus the regulations on the important anti-corruption interests to be served" (emphasis added)); *id.* at 686–87 (noting that statutory definition of "electioneering communications," for which disclosure requirements were upheld, includes time limitations of either 30 or 60 days before an election).

Moreover, the Nevada Statute is not only temporally ill-adapted to the special concerns regarding fraud during an election campaign but substantively ill-adapted as well. The Statute applies to communi-cations made with neither the intent nor the effect of influencing any election. An academic paper analyzing opinion polls regarding an upcoming election could be a publication of "information relating to an election," requiring inclusion of the source of any grants supporting the research. Nor is there is any requirement that any member of the pertinent electorate be exposed to, or influenced by, the publication. *Cf. McConnell,* 124 S.Ct. at 687 ("New FECA § 304(f)(3)(C) further provides that a communication is 'targeted to the relevant electorate' if it 'can be received by 50,000 or more persons' in the district or State the candidate seeks to represent."). For this reason as well, the Nevada Statute is not narrowly tailored to reach only that speech necessary to further its asserted interest in discouraging the impact of fraud on election results.

Nevada also posits that its statute is narrowly tailored to "protect[ ] candidates from unscrupulous attacks by requiring that those who seek to mislead the electorate into thinking that the *candidate* has taken certain positions disclose their identity." We disagree. Far more speech, such as speech in no way misleading, is affected by § 294A.320 than necessary to *protect candidates from others* "playing ventriloquist." *Majors I,* 317 F.3d at 723.

Additionally, the Statute contains exceptions for communications by candidates and political parties. *See* pp. 997–998, *infra.* No reason appears why candidates and political parties are less likely to engage in election-related fraud than other groups and entities; if anything, one would expect the opposite to be the case. For this reason as well, the Statute forwards

(g) The record of voting of a candidate if he formerly served or currently serves as a public officer.

the asserted interest in fraud prevention poorly if at all.

In sum, *McIntyre's* concern for fraud and libel prevention "during election campaigns" cannot serve to justify the Nevada Statute's intrusion on speech, due to the extremely broad purview of the Statute. Section 294A.320 is not limited to speech "during election campaigns," but covers all publications "relating to an election, candidate or any question on a ballot." It covers ballot proposition elections, in which libel is a remote concern. It is riddled with exceptions that do not comport with the asserted interest in fraud prevention. The information it requires is unlikely to be of any real assistance to voters.

The state has therefore not established that § 294A.320 is narrowly tailored to further its interest in fraud prevention.

### iii. *Campaign Finance*

Nevada posits a third state interest: the enforcement of "disclosure and contribution election laws." Nevada argues that § 294A.320 "directly advances ... the state's ability to investigate and enforce other campaign finance laws that are, in fact, constitutional." To evaluate such an argument, one must pay close attention to the relationship between the challenged regulation and the particular set of laws it purportedly helps to enforce. We therefore begin by looking closely at Nevada's campaign reporting requirements.

Nevada's election laws include the following reporting requirements: (1) "Every person who is not under the direction or control of a candidate for office" must report to the Secretary of State campaign contributions received in excess of $100, and expenditures made on behalf of a can-

didate for office, Nev.Rev.Stat. § 294A.140; (2) "Every person ... who advocates the passage or defeat of a question ... on the ballot" must report to the Secretary of State campaign contributions received in excess of $100, Nev.Rev.Stat. § 294A.150; (3) "Every person who is not under the direction or control of a candidate for an office" must report to the Secretary of State expenditures made on behalf of the candidate in excess of $100, Nev.Rev.Stat. § 294A.210; (4) "Every person or group of persons organized formally or informally who advocates the passage or defeat of a question ... on the ballot" must report to the Secretary of State expenditures made on behalf of or against the question on the ballot in excess of $100, Nev.Rev.Stat. § 294A.220.

Because of the dichotomy established in the case law between regulation of ballot-initiative elections and regulation of candidate elections, and because the Nevada Statute applies to both varieties of elections, we are confronted by the initial question of whether the reporting requirements pertaining to ballot-initiative advocacy themselves are constitutional. If Nevada's entire regulation of ballot-measure advocacy were unconstitutional, then enforcing such unconstitutional election laws could not possibly constitute a compelling state interest.

*California Pro–Life Council v. Getman* stated that "[w]hether a state may regulate speech advocating the defeat or passage of a ballot measure is an issue of first impression in the federal courts of appeal," 328 F.3d at 1100, as opposed to the regulation of speech advocating the defeat or election of a candidate.[11] In

---

11. The Supreme Court in *Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley,* 454 U.S. 290, 300, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981), held that a $250 limi-

tation on how much an individual could contribute in a single election in support of or opposition to a particular ballot measure vio-

*California Pro–Life Council,* the court did not decide whether California had the requisite compelling interest in regulating ballot-measure advocacy by imposing a reporting requirement on those engaged in it, but instead held that such speech was not "absolutely protected," and therefore may be regulated if the State's regulation passes strict scrutiny. *Id.* at 1103–04.

We do not need to go any further than *California Pro–Life Council* in deciding whether reporting requirements like Nevada's are constitutional. Even if the reporting requirements are constitutional, and even if the state interest in enforcing those reporting requirements is "overriding," we conclude, for a number of reasons, that Nevada's on-publication identity disclosure requirement is not narrowly tailored to achieve the goal of enforcing the reporting requirements.

First, Nevada's reporting requirements themselves largely belie the asserted governmental enforcement interest in requiring on-publication identification. The on-publication identity disclosure requirement does not apply to "any candidate or to the political party of that candidate which pays for or is responsible for paying for any billboard, sign or other form of advertisement which refers only to that candidate and in which the candidate's name is prominently displayed." Nev.Rev.Stat. § 294A.320(2)(a). Also, on-publication disclosure is not required "[i]f the material is expressly approved and paid for by the candidate and the cost of preparation and publishing has been reported by the candidate as a campaign contribution pursuant to NRS 294A.120." Nev.Rev.Stat. § 294A.320(2)(b). So, far from aiding in the enforcement of the disclosure requirement, the Statute *excludes* many of the most important instances in which reporting is required and makes reporting a

substitute for on-publication identification in some instances.

Even in those situations where the identification requirements might assist the state in enforcing the other campaign finance statutes, the Nevada Statute does not match up with those statutes. For one thing, § 294A.320 requires no statement of how much money was contributed to produce a publication and contains no financial threshold. It thus affects a person spending $100, like McIntyre, in the same manner as a person spending $1 million. As stated by the ACLUN, under the Nevada Statute "an anonymous flyer created by a single rich individual for a million dollars is permitted while a small group that can raise a few hundred dollars for an anonymous political flyer is in violation." *Cf. McConnell,* 124 S.Ct. at 693 (challenged "amendments to FECA § 304 mandate disclosure only if and when a person makes disbursements totaling more than $10,000 in any calendar year to pay for electioneering communications").

*Buckley v. Valeo* recognized that an anonymous political advertisement may be a surreptitious campaign finance violation. 424 U.S. at 81, 96 S.Ct. 612. Section 294A.320, however, has no disclosure requirements beyond the sacrifice of anonymity. One cannot tell from an accurate on-communication disclosure mandated by the Statute whether the cost of producing the communication later reported by an organization or entity bears any resemblance to reality, or even whether the person identified has a reporting obligation at all (or is instead below the financial threshold for reporting). Moreover, Nevada has not explained why a group willing to violate the reporting and disclosure laws by failing accurately to report its expenditures after-the-fact would not be

lated the First Amendment rights of association and expression.

willing to violate § 294A.320 as well, by including no identifying information or inaccurate identifying information. The assistance provided by the Nevada Statute toward enforcing the campaign finance laws is therefore minimal. *Cf. Wash. Initiatives Now!*, 213 F.3d at 1139 ("The State's interest in educating voters through campaign finance disclosure is more adequately served by a panoply of the State's other requirements that have not been challenged.").

Section 294A.320 also covers far more speech than is necessary to publicize the identities of people *otherwise* subject to financial reporting requirements under the core provisions of Nevada campaign finance law. Section 294A.210(1), for instance, requires for designated annual periods that:

> Every person who is not under the direction or control of a candidate for an office at a primary election, primary city election, general election or general city election, of a group of such candidates or of any person involved in the campaign of that candidate or group who makes an expenditure *on behalf of the candidate or group which is not solicited or approved by the candidate or group,* and every committee for political action, political party or committee sponsored by a political party which makes an expenditure on behalf of such a candidate or group of candidates shall ... report each expenditure made during the period on behalf of the candidate, the group of candidates or a candidate

in the group of candidates in excess of $100....

(Emphasis added).[12] Section 294A.320, however, reaches speech in addition to that covered by the reporting and disclosure requirements. As noted, the Statute has no minimum spending requirement, so it covers communications that need not be reported. And the Statute, as also noted, pertains to expression regardless of whether it is "on behalf of" a candidate or ballot question, although such neutral communications need not be reported under Nevada law. Section 294A.320, for example, would require the publishers of two flyers costing more than $100, one stating "Spoil your ballots; they're all crooks!" and the other "Vote for Jones," to include their names, while the publishers of the former would not have to report their expenditure under § 294A.210(1) because it is not on behalf of any candidate.

Our decision in *Arizona Right to Life Political Action Committee v. Bayless* provides a helpful analogue for assessing the adequacy in this regard of the "fit" between the Nevada Statute and its asserted purpose as an aid to enforcement of other campaign finance regulation. *Bayless* addressed the constitutionality of an Arizona statute that required political action committees ("PAC"s) to give advance notice before engaging in certain types of political speech within ten days before an election. The court found the statute not narrowly tailored as a means of addressing Arizona's proffered concerns about informing its electorate and avoiding corruption or the appearance of corruption in the political process. *See* 320 F.3d at 1010.

**12.** Section 294A.220(1) is the comparable provision for ballot questions:

Every person or group of persons organized formally or informally who advocates the passage or defeat of a question or group of questions on the ballot at a primary election, primary city election, general election or general city election shall ... report each expenditure made during the period *on behalf of or against the question,* the group of questions or a question in the group of questions on the ballot in excess of $100.... (Emphasis added).

In its analysis, *Bayless* aptly demonstrated why a statute such as Nevada's fails to satisfy the required "fit" between core political speech restriction and compelling state interests:

> [T]he statute is over-inclusive because it is not limited to negative campaigning but rather reaches all of a PAC's independent expenditures that advocate for or against the election of any candidate. Because the notice requirement applies even if the expenditure merely paid for vanilla advertisements advocating "Vote for Smith," or "Freedom Lovers for Jones—Re-elect Our Senator," § 16–917(A) burdens innocuous speech that does not even implicate the statute's stated purpose.

*Id.* at 1012 (citing *Grossman v. City of Portland*, 33 F.3d 1200, 1207–08 (9th Cir. 1994)). Similarly, the Nevada Statute does not comply with the narrow tailoring requirement, as it reaches a substantial quantity of speech not subject to the reporting and disclosure requirements it purportedly helps to enforce.

Further contributing to the lack of narrow tailoring with regard to the asserted campaign finance regulation purpose is the Nevada Statute's failure to limit its proscription on anonymous speech to a designated time period. In *McIntyre*, the Court noted that Ohio's statute "applies not only to leaflets distributed on the eve of an election, when the opportunity for reply is limited, but also to those distributed months in advance." 514 U.S. at 352, 115 S.Ct. 1511; *see also id.* at 352 n. 16, 115 S.Ct. 1511 (commenting with disapproval on the "temporal breadth of the Ohio statute"). A properly time-limited statute might cure some of the over-inclusiveness of the Nevada Statute as an aid to enforcement of other campaign finance regulations, by focusing on the campaign-related speech as to which the public's

interest in obtaining complete and timely disclosure is greatest. In the absence of any temporal limitation, however, the Nevada Statute's broad ban on anonymous election-related speech is all the more over-inclusive, and does not meet the applicable exacting scrutiny required.

In sum, Nevada's presentation of § 294A.320 as a salutary means of ensuring campaign financial disclosure is entirely unconvincing in light of the particulars of Nevada's overall scheme of campaign finance regulation. The statute "plainly is not its principal weapon against [campaign finance abuses]," *McIntyre*, 514 U.S. at 350, 115 S.Ct. 1511—or, indeed, any effective weapon at all—and is therefore not narrowly tailored to the state's interest.

Our conclusion that the Nevada statute at issue here is not narrowly tailored to assist the state in enforcing other campaign finance laws should not in any way suggest that an on-publication identification requirement could never be narrowly tailored to achieve this goal. As we have developed, Nevada's statute is particularly ill-designed for this purpose. An on-publication identification requirement carefully tailored to further a state's campaign finance laws, or to prevent the corruption of public officials, could well pass constitutional muster. Nevada's statute, however, is simply not a viable example of such legislation.

The upshot is that none of Nevada's three proffered governmental interests suffices to outweigh the significant First Amendment protection of anonymity accorded by *McIntyre*.

## IV

### *Decisions since* McIntyre

None of the case law subsequent to *McIntyre* persuades us that we are wrong

in our assessment that the Nevada Statute cannot be sustained under that precedent.

Two state supreme court decisions upheld anonymous campaign speech statutes after *McIntyre*. *See Seymour v. Elections Enforcement Comm'n*, 255 Conn. 78, 762 A.2d 880 (2000); *Doe v. Mortham*, 708 So.2d 929 (Fla.1998).[13] *Seymour*, however, pertained only to "elections and party-related solicitations," not to "referenda or other issue-based ballot measures." 762 A.2d at 886–87. The Nevada Statute, like the statute in *McIntyre*, does apply to ballot questions, and thereby reaches a substantial quantity of speech as to which the corruption rationale for regulating campaign speech, stressed in *Buckley v. Valeo* and in *McConnell*, has no application. Additionally, the Connecticut provision, unlike section 294A.320, was limited "to candidates and those associated with candidates, not persons unrelated to that candidacy." *Seymour*, 762 A.2d at 892. Whether or not the statute challenged in *Seymour* is constitutional, it precludes considerably less anonymous speech than the statute here at issue.

Although the Florida Supreme Court's decision in *Doe* is at odds with our holding, we do not find its reasoning convincing. *Doe* depended on its understanding of *McIntyre* as limited to a solitary individual's expression. *See* 708 So.2d at 934. We reject this reading of *McIntyre*, for the reasons we have already explained.

In *Majors II*, the Seventh Circuit upheld the constitutionality of an Indiana statute prohibiting anonymous campaign literature. The statute requires advertising that "expressly advocat[es] the election or defeat of a clearly identified candidate" to include "adequate notice of the identity of persons who paid for ... the communi-

cation." 361 F.3d at 350 (quotation marks and citation omitted). Elements of *Majors II* may be read to be inconsistent with our opinion.

In particular, the *Majors II* majority fails to accord sufficient significance, in our view, to the distinction we regard as determinative between a prohibition of the circulation of communication based on its content and a requirement that the financing of election-related communications be separately reported. While *Majors II* noted "the distinction the Supreme Court has drawn between 'disclosure' (reporting one's identity to a public agency) and 'disclaimer' (placing that identity in the ad itself)," *id.* at 354, it did not discuss the conceptual distinction for First Amendment purposes between a regulation that alters a communication and one that does not. Nor did *Majors II* give any weight to the Supreme Court's distinction, concluding instead—incorrectly, we believe—that there is no meaningful difference with regard to the protection of anonymous speech between a requirement that the identity of the publisher be revealed later and in less detail and a requirement that identifying information be included on the communication itself. *See id.* at 353 ("Like the Indiana statute, the provision of the Bipartisan Campaign Reform Act that the [*McConnell*] Court upheld requires identifying *any* person who contributes to the making of the ad, even if the person is not a candidate or part of the candidate's campaign staff. True, what is required is disclosure to an agency rather than disclosure in the political ad itself, but, as is apparent from the Court's reference to 'providing the electorate with information,' the identity of the contributor is available to the public rather than secreted by the

---

**13.** *But see Doe v. State*, 112 S.W.3d 532 (Tex. Crim.App.2003) (holding unconstitutional a statute requiring persons who enter into agreements to print, publish, or broadcast political advertising to forfeit their anonymity).

FEC." (Citation omitted)). *But see id.* at 357 (opinion of Easterbrook, J., *dubitante*) ("The majority in *McConnell* emphasized that the disclosure to the agency did *not* include the content of the advertisement. In Indiana the disclosure is affixed to the speech; the association is unavoidable; does this make a difference? My colleagues think not; I am not so sure." (Internal citation omitted)).

We recognize that the distinction we stress may at first glance appear finecut. But, as *McIntyre, Buckley v. American Constitutional Law Foundation,* and our decision in *California Pro–Life Council* discuss at some length, there *is* a difference of constitutional magnitude between mandatory identification with a particular message at the time the message is seen by the intended audience and the more remote, specific disclosure of financial information that, as *McIntyre* itself recognized, "is a far cry from compelled self-identification on all election-related writings." 514 U.S. at 355, 115 S.Ct. 1511.

This disagreement regarding the significance of *McIntyre* aside, the *result* in *Majors II* (and in the cases upon which it principally relies [14]) does not clash with ours. As *Majors II* recognizes, the statute in *McIntyre* covered speech concerning ballot questions, while the statute in *Majors II* does not. 361 F.3d at 351. *Majors II* posited that after *McConnell, McIntyre* is limited to statutes precluding anonymous speech regarding ballot questions. *See id.* at 353–54. While, for the reasons already stated, we are not convinced that *McConnell* so narrowed *McIntyre,* if it did, the Nevada Statute falls on the *McIntyre* side of the line and, even on *Majors II's* analysis, is invalid.

**14.** *See Majors II,* 361 F.3d at 354–55 ("A statute quite like the Indiana statute was ... upheld in *Gable v. Patton,* [142 F.3d at 940,

## Conclusion

Nevada has not met its burden under strict scrutiny of distinguishing its statute from that held facially unconstitutional in *McIntyre.* Section 294A.320 reaches far more core political speech than is necessary to achieve the state's otherwise legitimate interests, and advances those interests poorly if at all. We therefore VACATE the district court's grant of summary judgment and REMAND for further proceedings consistent with this opinion.

**VACATED AND REMANDED.**

944–45 (6th Cir.1998), and *Kentucky Right to Life, Inc. v. Terry,* [108 F.3d 637, 646–48 (6th Cir.1997)].").